# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  Steve W. Berman (*pro hac vice*)
   *steve@hbsslaw.com*
2  Barbara A. Mahoney (*pro hac vice*)
   *barbaram@hbsslaw.com*
3  HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Second Avenue, Suite 2000
4  Seattle, WA  98101
   Telephone: (206) 623-7292
5  Facsimile: (206) 623-0594

6  Christopher Pitoun (SBN 290235)
   *christopherp@hbsslaw.com*
7  HAGENS BERMAN SOBOL SHAPIRO LLP
   301 North Lake Avenue, Suite 920
8  Pasadena, CA 91101
   Tel: (213) 330-7150
9  Fax: (213) 330-7152

10
11 *Interim Lead Counsel for Plaintiffs and
   the Proposed Class*

12 *[Additional Counsel on Signature Page]*

13
                  UNITED STATES DISTRICT COURT
14
                 CENTRAL DISTRICT OF CALIFORNIA
15
                       WESTERN DIVISION
16

| | |
|---|---|
| 17  BARRY BRAVERMAN, *et al.*, | No. 8:16-cv-00966-TJH-SS |
| 18                    Plaintiffs, | **PLAINTIFFS' NOTICE AND MOTION TO EXCLUDE THE OPINIONS OF DEFENDANTS' PROPOSED EXPERT, DR. JONATHAN HIBBARD** |
| 19       vs. | |
| 20  BMW OF NORTH AMERICA, LLC, *et al.*, | [Filed concurrently with Decl. of Steve W. Berman ISO Plaintiffs' Reply ISO Mtn for Class Certification] |
| 21                    Defendants. | |
| 22 | Hearing Date: TBD |
| 23 | Time: TBD |
| 24 | Judge: Hon. Terry J. Hatter, Jr. |
| 25 | Courtroom: 9B |

26
27
28

---

**TO ALL PARTIES AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on a date to be determined by the Court, or as soon thereafter as the matter can be heard, in Courtroom of the Hon. Terry J. Hatter, Jr., located at United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, Courtroom 9B, 9th Floor, Plaintiffs Barry Braverman, Hakop Demirchyan, Joel Green, Dr. Glynda Roberson, Edo Tsoar, Peter Weinstein, Lawrence Curcio, Adeel Siddiqui, Charles Olsen, Robert Desatnik, Eric Wonderley, John Lingsweiler, Steve Ridges, and Brandon Cosinteno (née Redmond) ("Plaintiffs"), will and herby do, move for an order to excluding the opinions of defendants' proposed expert, Dr. Jonathan Hibbard, in support of their Opposition to Motion for Class Certification, on the basis that Dr. Hibbard's testimony fails to satisfy the standards set forth by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in Support of the Motion, the concurrently filed Plaintiffs' Reply in Support of Motion for Class Certification, the concurrently filed Declaration of Steve W. Berman in Support of Plaintiffs' Reply in Support of Motion for Class Certification, and any such further evidence and argument as may be presented to the Court at the hearing on this matter.

DATED: September 16, 2019          HAGENS BERMAN SOBOL SHAPIRO LLP


By: */s/ Steve W. Berman*
          Steve W. Berman (*pro hac vice*)
Sean R. Matt (*pro hac vice*)
Barbara A. Mahoney (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: barbaram@hbsslaw.com

Christopher Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone:  (213) 330-7150
Facsimile: (213) 330-7150
Email: christopherp@hbsslaw.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

Benjamin F. Johns (*pro hac vice*)
Andrew W. Ferich (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
Email: bfj@chimicles.com
Email: awf@chimicles.com

Jonathan A Michaels
MLG AUTOMOTIVE LAW APLC
2801 West Coast Highway, Suite 370
Newport, CA 92663
Telephone: (949) 527-6900
Facsimile: (949) 581-6908
Email: jmichaels@mlgautomotivelaw.com

Hovanes Margarian (SBN 246359)
THE MARGARIAN LAW FIRM
801 N. Brand Blvd., Suite 210
Glendale, CA 91203
Telephone: (818) 553-1000
Email: hovanes@margarianlaw.com

*Other Plaintiffs' Counsel*

1

**TABLE OF CONTENTS**

2

**Page**

TABLE OF AUTHORITIES .................................................................................... 1

I.    INTRODUCTION ................................................................................... 1

II.   BACKGROUND ..................................................................................... 2

     A.    Dr. Hibbard designed a survey uniquely *unsuited* for the task of determining Class knowledge and the impact of nondisclosure. ............ 2

     B.    Dr. Hibbard knowingly designed survey questions as compound questions, yet admitted that compound questions are indecipherable. ......................................................................................... 3

     C.    The survey asked respondents to affirm demonstrably false premises. ....................................................................................................... 4

     D.    Dr. Hibbard's survey design made no effort to track the actual sources of information available to the Class. ................................... 4

     E.    Dr. Hibbard failed to include an appropriate control to test for error or to net out the estimated error from his conclusions on Class knowledge and impact. ............................................................................. 5

     F.    Flaws in the critical question on Class knowledge also infiltrate the dependent question on the impact of nondisclosure on the Class. .......... 6

III.  STANDARD OF REVIEW ..................................................................... 6

IV.   ARGUMENT ........................................................................................... 7

     A.    Posing the critical question on Class knowledge of the defect as a compound question warrants exclusion. ................................................. 8

     B.    Dr. Hibbard's failure to pre-test questions or otherwise correct ambiguities provides another reason to exclude his survey ................. 10

     C.    As another basis for exclusion, responses to Dr. Hibbard's rare, open-ended questions strongly suggest that his respondents did not read the critical information relating to the defect. ............................... 11

     D.    Dr. Hibbard's description of the range extender strays far from the record and inserts false premises from which no reliable conclusions can be drawn from the respondents' answers. ................... 12

         1.    The check control message did not exist for 40% of the Class Period. ....................................................................................... 12

         2.    The owner's manuals do not provide the critical information Dr. Hibbard includes on the defect. ............................................. 12

3.    BMW's own test results contradict Dr. Hibbard's representations about the range of speed and the purported intent behind the defect. ................................................. 13

4.    Dr. Hibbard's results are counterintuitive because they show knowledge of the defect *decreasing* over time. ........................... 14

E.    The survey runs the serious risk of creating false memories by suggesting information that the respondents ostensibly should have known. ............................................................................................. 15

F.    Dr. Hibbard did not guard against the natural tendency of yea-saying. ............................................................................................ 16

1.    Dr. Hibbard's fantasy drone option does not provide an adequate control. ................................................................. 17

2.    The London launch control question fails for numerous reasons. .................................................................................. 18

3.    Dr. Hibbard failed to net out the error associated with the control in reaching his conclusions on the test question. ............ 19

V.    CONCLUSION ........................................................................................ 20

1
2

# TABLE OF AUTHORITIES

3

**Page(s)**

4

## CASES

5

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
6
   2010 U.S. Dist. LEXIS 132948 (D. Utah Dec. 15, 2010) ........................ 8, 9, 11, 16

7

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
8
   738 F.3d 960 (9th Cir. 2013) ................................................................................. 7

9

*AstraZeneca LP v. TAP Pharm. Prods.*,
10
   444 F. Supp. 2d 278 (D. Del. 2006) ............................................................... 11, 12

11

*Centex Homes v. Lexington Ins. Co.*,
12
   2016 U.S. Dist. LEXIS 188927 (C.D. Cal. Nov. 2, 2016) ................................... 12

13

*Clay v. Cytosport, Inc.*,
14
   2018 U.S. Dist. LEXIS 153124 (S.D. Cal. Sept. 7, 2018) ..................................... 7

15

*Escobar v. Just Born, Inc.*,
16
   2019 U.S. Dist. LEXIS 115743 (C.D. Cal. Mar. 25, 2019) ................................... 7

17

*Fish v. Kobach*,
18
   309 F. Supp. 3d 1048 (D. Kan. 2018) .................................................................. 9

19

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
20
   2008 U.S. Dist. LEXIS 118344 (S.D. Cal. July 8, 2008) .................................... 15

21

*Kennedy v. Collagen Corp.*,
22
   161 F.3d 1226 (9th Cir. 1998) .............................................................................. 7

23

*M2 Software, Inc. v. Madacy Entm't*,
24
   421 F.3d 1073 (9th Cir. 2005) .............................................................................. 2

25

*Negrete v. Allianz Life Ins. Co.*,
26
   2013 U.S. Dist. LEXIS 176313 (C.D. Cal. Dec. 9, 2013) ................................... 15

27

*New York v. United States DOC*,
28
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ................................................................ 10

*Potts v. Hamilton*,
   334 F. Supp. 2d 1206 (E.D. Cal. 2004) ........................................................ 8, 16

*Sali v. Corona Reg'l Med. Ctr.*,
    889 F.3d 623 (9th Cir. 2018) ............................................................... 6, 7

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ....................................... 16, 17, 19

*Townsend v. Monster Bev. Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018)............................................... 7

*United States v. Dentsply Int'l, Inc.*,
    277 F. Supp. 2d 387 (D. Del. 2003) ...................................................... 10

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) ....................................... 16, 17, 20

*Wortman v. Air New Zealand*,
    326 F.R.D. 549 (N.D. Cal. 2018) ........................................................ 6

### OTHER AUTHORITIES

1 Trademark Surveys: A Litigator's Guide § 2.09 ................................. 11, 16

American Association for Public Opinion Research, *Best Practices for
    Survey Research*, https://www.aapor.org/Standards-Ethics/Best-
    Practices.aspx#best6 ........................................................................ 10

Amina Memon, Christian Meissner & Joanne Fraser, *The Cognitive
    Interview: A meta-analytic review and study space analysis of the past
    25 years. Psychology Public Policy and Law*, 16 PSYCH. PUB. POL.
    AND L. 340, 342 (2010) ................................................................... 15

Amy Trenary, Casenote and Comment, *State v Henderson: A Model for
    Admitting Eyewitness Identification Testimony*, 84 U Colo. L. Rev.
    1257, 1264 (2013)........................................................................... 15

Joyce W. Lacy & Craig E. L. Stark, *The Neuroscience of Memory:
    Implications for the Courtroom* .......................................................... 15

*The new BMW i3 94Ah*, https://www.press.bmwgroup.com/united-
    kingdom/article/detail/T0259612EN_GB/the-new-bmw-i3-
    94ah?language=en_GB ................................................................... 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Shari Seidman Diamond, *Reference Guide on Survey Research*,
    REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Fed. Judicial Ctr. 3d
    ed. 2011) ................................................................................................................. 10

1

## I.    INTRODUCTION

2        Dr. Hibbard's survey provides no reliable basis supporting his conclusion that

3   most class members knew about the defect or did not care about it.  Critically, his survey

4   left out Plaintiffs' central allegations that the range extender presents a serious collision

5   danger by causing sudden and terrifying involuntary drops in speed without signaling

6   this decrease through the car's brake lights.  And he did not take any steps to prevent

7   creating false memories or suggesting responses.  For example, he did not let

8   respondents freely answer what they remembered knowing about the range extender

9   before buying or leasing their cars.

10        Instead, Dr. Hibbard posed the question of class member knowledge as a five-

11  part, hopelessly compound question (thereby generating 32 possible inferences), from

12  which no reliable inferences about Class knowledge can be drawn.  This critical question

13  also includes false factual premises, which introduce further error and provide additional

14  reasons for exclusion. Dr. Hibbard also buried the critical information of speed

15  reduction in the third of his five-sentence description of the range extender, and did no

16  pre-testing to see whether respondents understood his question or even read it all the

17  way through.  The few open-ended questions he permitted strongly suggest they did not.

18  Respondents, who answered that their lack of knowledge about the range extender

19  definitely or probably would not have affected them, were asked to explain why: only

20  *30%* of the respondents provided explanations that reflected an understanding that the

21  range extender reduces speed or power.

22        Although Dr. Hibbard purportedly designed the survey as a test/control study, he

23  did not pose similar questions to his control group.  Nor did he use his control group's

24  results to estimate the underlying error rate of his survey (*e.g.*, the extent respondents

25  guessed), and he did not use this estimated error rate to adjust his conclusions about the

26  purported rate of Class knowledge.  Had he done so with his existing controls, Dr.

27  Hibbard's estimate of class member knowledge would have dropped substantially.  All

28                                            -1-

of the flaws relating to Dr. Hibbard's estimate of purported knowledge also necessarily pervade his estimate of the purported impact of nondisclosure.

Plaintiffs recognize that most survey criticisms go to weight and not admissibility. *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005). But the Hibbard survey is so poorly done, unreliable, and biased that it should be excluded and not be considered in support of BMW's opposition to class certification.

## II.   BACKGROUND

Two years ago, Dr. Hibbard conducted a survey of owners and lessees of 2014 through 2016 model year BMW i3 vehicles with the Range Extender option. Dkt. No. 152-21 ("Hibbard Report"), ¶¶ 21-22. His survey purportedly addressed whether (i) consumers were aware, pre-purchase or pre-lease, of information relating to the alleged defect, and (ii) if not, whether having that information at the time of purchase or lease would have changed their decision to purchase or lease the vehicle. *Id*., ¶ 15.

### A.   Dr. Hibbard designed a survey uniquely *unsuited* for the task of determining Class knowledge and the impact of nondisclosure.

Unlike Plaintiffs' highly sophisticated conjoint survey, which measures respondents' valuation of the defect indirectly through a multi-faceted process, Dr. Hibbard's survey asked respondents directly to confirm or deny whether they knew information about the range extender one to three years earlier, when they bought or leased their cars. Then, only if they deny prior knowledge, did he ask whether the information would have affected their decision to purchase or lease their cars.

Dr. Hibbard provided the following information about the range extender and asked respondents to confirm or deny whether they had prior knowledge:

> The Range Extender is designed to enable further driving in situations in which the purely electric range is not sufficient to get to the next charging station. The Range Extender activates when the battery state of charge is 6.5%. If the battery state of charge drops below 2%, the drive power (vehicle speed) is reduced on sharp uphill grades or from high speeds down to 35-40 mph and limited to this maximum speed

-2-

range to allow further driving. This is done to avoid a
complete discharge of the high-voltage battery. A Check
Control message in the car's performance display indicates an
upcoming reduction in drive power.  [*Id.* ¶ 14]

Notably, Dr. Hibbard's description omitted Plaintiffs' critical allegations, which
have ample support in the record.  He did not ask respondents whether they knew that
the range extender decelerates abruptly with a sudden and terrifying loss in speed, and
that the brake lights do not go on, as the car decelerates, creating an added safety hazard.
Dkt. Nos. 124 (sealed) & 123-63 (public) ("Class Cert. Br."), at 5-7; Berman Reply
Decl., Ex. 1 at 295:21-22.

Dr. Hibbard also admittedly did not let respondents report their memories in their
own terms, through open-ended questions, as cognitive science suggests should have
been done to avoid suggesting or contaminating memories.  Hibbard Report, ¶ 37.  He
offers no authority that his lengthy, five-sentence predicate adequately addressed the
inherent danger of "yea-saying" or that suggesting five unique facts that respondents
ostensibly would have known can avoid the risk of creating false memories.  Berman
Reply Decl., Ex. 9 at 65:18-69:12.

**B.     Dr. Hibbard knowingly designed survey questions as compound questions,
yet admitted that compound questions are indecipherable.**

Dr. Hibbard admitted that compound questions generate responses that present
multiple interpretations and cannot be deciphered reliably.  *Id.* at 42:2-43:15. He
admitted further that his critical question on knowledge asked respondents to deny or
affirm at least five unique facts.  *Id.* at 67:10-68:15.  Nonetheless, Dr. Hibbard did
nothing to avoid the danger of compounding, such as asking respondents to affirm or
deny each of the five factual assertions separately, or at a minimum instructing
respondents to affirm only if they recalled knowing all of the five factual assertions.
Berman Reply Decl., Ex. 9 at 83:9-84:23.

-3-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.      The survey asked respondents to affirm demonstrably false premises.**

Dr. Hibbard needlessly introduced false premises into his test questions. He described, for example, a "Check Control message" that did not exist in Class Cars for 40% of the Class Period and, therefore, would not have been true for any respondents who purchased or leased cars before March 15, 2015.  As to the maximum speeds Dr. Hibbard describes in his survey, BMW's own testing contradicts this, showing instead a far greater range of possible speeds when the batteries drop below 2% state of charge. Class Cert. Br. at 4-5; Berman Decl., Exs. 4 and 9; Berman Reply Decl., Ex. 2.  Dr. Hibbard's assertion that BMW designed sudden speed reductions—without activating the cars' brake lights—to spare the batteries confuses the cause with the effect.  BMW's own documents show that the range extender reduces the speed of Class Cars when its under-sized engine generates less electrical energy than the much more powerful i3 electrical motor consumes; the range extender has no bearing on the natural cessation of power that occurs when the cars run out of fuel.  Class Cert. Br. at 5; Berman Decl., Ex. 9 at 1091 and 1093; Dkt. No. 125-33 ("Donahue Report"), at 4; and Berman Reply Decl., Ex. 20 ███████████████████████████████████████████ ██████████████████████████████████████  Thus, respondents who affirmed based on any of these false premises were clearly mistaken.

**D.      Dr. Hibbard's survey design made no effort to track the actual sources of information available to the Class.**

Dr. Hibbard made no effort to ensure that Class members had contemporaneous access to sources of the information he includes in his survey questions.  Berman Reply Decl., Ex. 9 at 69:24-70:11.  He did not review the 2014 owner's manual, which contains none of the information he recites in his question on knowledge.  *Id.* at 20:17-21:5.  He did not review BMW's other survey, concluding that only 4.7% of class members reviewed an owner's manual before purchasing or leasing their cars.  *Id.* at 24:13-22; Dkt. No. 152-22 ("Isaacson Report"), ¶ 68, Table J.  And he took huge liberties with the

-4-

1    2014 and 2015 owner's manuals, which do not mention any loss of speed or provide

2    any information about the states of charge that activate the range extender or cause it to

3    suddenly decrease speed.  Dkt. Nos. 151-1 (sealed) & 152 (public) ("Zarafian Decl."),

4    Exs. 14 and 15.

5    One would expect awareness of the defect to increase over time as the body of

6    available information allegedly grew.  But Dr. Hibbard's unusual data shows the

7    opposite trend.  Professed awareness among survey respondents reached its highest

8    among owners and lessees of the 2014 model and its lowest among owners and lessees

9    of the 2016 model, strongly suggesting that something other than knowledge of the

10   defect is generating the affirmative responses.  Berman Reply Decl., Ex. 3 ("Gaskin

11   Rebuttal"), ¶ 56, Table 2.

12   **E.    Dr. Hibbard failed to include an appropriate control to test for error or to
13         net out the estimated error from his conclusions on Class knowledge and
         impact.**

14   Dr. Hibbard said that he offered a control question to estimate the degree of

15   noise—*i.e.*, guessing or responding for reasons unrelated to the critical question.  But

16   his control question about the timing of the launch of the i3 in London, U.K., and the

17   number and location of dealers who initially offered it there, bears little resemblance to

18   his test question on Class knowledge except that he designed the control question, too,

19   as a compound question with false premises and information that was not likely

20   available during the Class Period.  *See* Hibbard Report, ¶ 35; Gaskin Rebuttal, ¶ 59.

21   And despite the 17% noise he encountered in the control question, Dr. Hibbard did not

22   use these results to estimate his survey's error rate and downwardly adjust his

23   conclusions about Class member knowledge from 60.5% to 43.6%.  Hibbard Report, ¶

24   55, n.4; Gaskin Rebuttal, ¶ 60.  Dr. Hibbard also offered a second, free-standing control

25   question, that asked respondents whether they knew that BMW offered a fictitious drone

26   option to fly ahead of the vehicle and provide images of traffic in areas where satellites

27   are not available.  Hibbard Report, ¶ 48.  Only one respondent fell for this implausible

28

-5-

premise, and even then Dr. Hibbard removed the respondent from the final results but did not otherwise adjust his statistical analysis based on that noise.  Berman Reply Decl., Ex. 9. at 129:12-19.

**F.   Flaws in the critical question on Class knowledge also infiltrate the dependent question on the impact of nondisclosure on the Class.**

The flawed construction of Dr. Hibbard's critical question on Class member knowledge also afflicted his question on the impact of nondisclosure.  By burying the critical information that the range extender reduces vehicle speed in the third of a five-sentence description, he increased the probability that participants in his three-minute survey would not see it.  Gaskin Rebuttal, ¶ 48; Hibbard Report, ¶ 14.  He did no pretesting and posed no open-ended questions to respondents who affirmed knowledge to test whether they had.

Dr. Hibbard did ask those who denied prior knowledge whether the information he provided would have changed their leasing or purchasing decision and to state in their own words why or why not.  Critically, their responses to the open-ended question strongly suggest survey respondents did *not* read his description of the range extender all the way through.  Remarkably, among the 38 respondents who answered that the information he provided definitely or probably would not have affected their decisions, only 11 (30%) gave an explanation that clearly reflected that they understood that the range extender reduces speeds on hills or from high speeds.  Berman Reply Decl., Ex. 9 at 196:22-197:7; Gaskin Rebuttal, ¶ 64.

### III.   STANDARD OF REVIEW

"[T]he issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of [damages] through generalized proof."  *Wortman v. Air New Zealand*, 326 F.R.D. 549, 559 (N.D. Cal. 2018) (quotation omitted).  The Court should not be drawn "into an evidentiary shooting match" at class certification.  *Sali v.*

-6-

*Corona Reg'l Med. Ctr.*, 889 F.3d 623, 631 (9th Cir. 2018).  "Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification."  *Id.* at 632; *see also Escobar v. Just Born, Inc.*, 2019 U.S. Dist. LEXIS 115743, at *2 (C.D. Cal. Mar. 25, 2019) (Hatter, J.).  When weighing an expert opinion in support of class certification, the Court must consider whether it would ultimately be admissible under Federal Rule of Evidence 702.  "But admissibility must not be dispositive.  Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Sali*, 889 F.3d at 634.

Evaluating an expert's admissibility consists of assessing the expert's "reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one.  Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).  "Disputes as to the strength of [experts'] credentials, faults in [their] use of [a particular] methodology, or lack of textual authority for [their] opinion, go to the weight, not the admissibility, of [their] testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (citation omitted).  Even under this relaxed standard, an expert may be excluded. *See, e.g.*, *Clay v. Cytosport, Inc.*, 2018 U.S. Dist. LEXIS 153124, at *21 (S.D. Cal. Sept. 7, 2018) (granting Defendant's motion to exclude expert's opinion for purposes of class certification, where the expert's conclusions were not supported by sufficient facts or data); *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1038 (C.D. Cal. 2018) (granting in part class plaintiffs' motion to exclude a defense expert who did not support his use of non-standardized data).

## IV.   ARGUMENT

Dr. Hibbard's three-minute survey barely satisfies the relevance requirement because he leaves out crucial details from Plaintiffs' theory of harm:  the abrupt nature

-7-

of the power reduction, the sudden and terrifying loss in speed, and the fact that the brake lights do not go on, as the car decelerates, creating a safety hazard. Gaskin Rebuttal, ¶ 44; Berman Reply Decl., Ex. 9 at 205:20-206:2 (admitting respondents took three minutes to complete his survey); Berman Reply Decl., Ex. 1 at 295:16-22. And neither BMW nor Dr. Hibbard explain how the purported high level of Class knowledge came about, when BMW did not disclose the defect to Class members, barely advertised the i3s, did not ask its dealers to warn consumers about the defect. Further, the Class Period saw no investigations into the defect by government, consumer groups, or major media. Class Cert. Br. at 7-8 and n.35-n.37; Gaskin Rebuttal, ¶¶ 50-55 & Ex. C.

A detailed examination of the Hibbard survey explains the disconnect between the record and his survey results—and why the Court cannot rely on Dr. Hibbard's faulty conclusions.

### A. Posing the critical question on Class knowledge of the defect as a compound question warrants exclusion.

Survey "questions should be directed to one and only one issue or topic." 1 Trademark Surveys: A Litigator's Guide § 2.09. "If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 2010 U.S. Dist. LEXIS 132948, at *24-25 (D. Utah Dec. 15, 2010) (quoting Shari Seidman Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 248 (Fed. Judicial Ctr. 2d ed. 2000)). For example, "compound questions contain two or more elements, making it impossible to determine which element the respondent addressed in his or her response." *Potts v. Hamilton*, 334 F. Supp. 2d 1206, 1217 (E.D. Cal. 2004), *sum. jud. rev'd sub nom. Potts v. Zettel*, 220 F. App'x 559 (9th Cir. 2007). Following this principle, the court in *1-800 Contacts* excluded the plaintiff's survey because it posed the question to determine whether the respondents qualified to take the survey as a compound question and thus failed to reliably establish that the survey used the appropriate sample population. 2010

-8-

U.S. Dist. LEXIS 132948, at *28 (finding a survey inadmissible under Rule 702 because the threshold question was compound and without any ability to determine which respondents had actually used or would use the Internet to purchase contact lenses).  In *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1061 (D. Kan. 2018), the court similarly excluded the defendant's survey because the survey posed the critical questions as compound questions and failed to ask relevant questions to clear up the ambiguity introduced by these questions.

Dr. Hibbard fully acknowledged the impropriety of compound survey questions and that responses to such questions are indecipherable.  Berman Reply Decl., Ex. 9 at 42:2-43:15.  Yet he formulated the predicate question on Class knowledge as a five-sentence compound question.  Gaskin Rebuttal, ¶ 47; *see also* Berman Reply Decl., Ex. 9 at 68:12-15 (admitting that his compound question asserted at least five unique facts).  Because Dr. Hibbard did not pose separate questions for each assertion or instruct respondents to affirm only if they recalled knowing all of them, their responses are indecipherable, open to 32 independent interpretations.  Gaskin Rebuttal, ¶¶ 47-48.

And Dr. Hibbard unfairly buried the critical information that the range extender can cause a reduction in speed in the third of his five-sentence description, where survey respondents were least likely to notice it.  Due to the compound nature of the question, respondents—taking only three minutes to complete the survey—may only have affirmed prior knowledge of assertions tangential to the defect, *e.g.*, that the range extender was for use when the battery power was not available (as stated in the first sentence), or that it did not start until the battery was nearly depleted (as stated in the second sentence), while not even noticing the troubling assertion that the range extender will reduce high speeds to 35-40 mph when the state of charge drops below 2% (as buried in the third sentence).  Dr. Hibbard's survey should be excluded for the same reasons the *1-800 Contacts* and *Fish* courts excluded surveys: no reliable conclusions can be drawn from compound questions.

**B.    Dr. Hibbard's failure to pre-test questions or otherwise correct ambiguities provides another reason to exclude his survey.**

Shari Seidman Diamond recommends pretesting in her Reference Guide on Survey Research.  Shari Seidman Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 388-89 (Fed. Judicial Ctr. 3d ed. 2011) ("The interviewers observe the respondents for any difficulties they may have with the questions and probe for the source of any such difficulties so that the questions can be rephrased if confusion or other difficulties arise.").  The American Association for Public Opinion Research, the leading association of public opinion and survey research professionals, also strongly recommends pretesting in its list of best practices for survey research:  "Because it is rarely possible to foresee all the potential misunderstandings or biasing effects of different questions or procedures, it is vital for a well-designed survey operation to include provision for a pre-test."[1]  Similarly, the Census Bureau mandates "pre-testing of any questions to be added to data-collection products such as the census questionnaire."  *New York v. United States DOC*, 351 F. Supp. 3d 502, 527 (S.D.N.Y. 2019).

Astonishingly. Dr. Hibbard claimed at his deposition that pretesting was neither customary nor necessary.  By itself, his failure to pretest may not serve as grounds for exclusion.  But it is warranted here, when pretesting could have led to appropriate modifications of his compound question on Class knowledge.  For example, in *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 436 (D. Del. 2003), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005), the court excluded the Department of Justice's expert survey because, among other things, the questionnaire instructions were complex and confusing and the government's expert had not conducted a pre-test to correct these problems.  Similarly, Dr. Hibbard did nothing to ensure that respondents understood his

---

[1] American Association for Public Opinion Research, *Best Practices for Survey Research*,   https://www.aapor.org/Standards-Ethics/Best-Practices.aspx#best6   (last accessed Sept. 16, 2019).

-10-

1    questions, and he admitted that he could have designed the survey to clarify whether

2    they were merely assenting that they knew some of the information about the way that

3    the range extender operated, as opposed to the crucial facts about the defect.  Berman

4    Reply Decl., Ex. 9 at 83:9-84:23.

5    **C.**    **As another basis for exclusion, responses to Dr. Hibbard's rare, open-ended
          questions strongly suggest that his respondents did not read the critical
6          information relating to the defect.**

7         "The most powerful information comes through unaided questions.  The reason

8    that unaided questions [a.k.a. open-ended questions] are so powerful is that they capture

9    top-of-mind knowledge."  1 Trademark Surveys: A Litigator's Guide § 2.09.  Whereas

10   open-ended questions "give the respondent fewer hints about the answer that is expected

11   or preferred," a close-ended question, which offers respondents a limited set of response

12   options, is more restrictive and potentially biased.  *1-800 Contacts*, 2010 U.S. Dist.

13   LEXIS 132948, at *22.

14        The open-ended responses in Dr. Hibbard's survey demonstrate that his

15   respondents did not fully understand his close-ended question on past knowledge or did

16   not fully read his description of the range extender.  In response to Dr. Hibbard's close-

17   ended question, thirty-eight respondents indicated that the information he provided

18   about the range extender definitely or probably would not have affected their decision

19   to purchase or lease an i3 REx.  But in response to his open-ended question asking them

20   to explain their answer, only 11, or 30% of respondents, answered in a way that reflected

21   an understanding that the range extender affects vehicle speed.  Hibbard Report, ¶ 59

22   (total of 38 respondents, stating that the knowledge probably or definitely would not

23   have changed their purchase or lease decision); Berman Reply Decl., Ex. 9 at 196:22-

24   197:9 (identifying 11 responses that did not reflect an understanding of the defect).

25        A similar discrepancy between responses to close-ended and open-ended

26   questions led the court in *AstraZeneca LP v. TAP Pharm. Prods.*, 444 F. Supp. 2d 278,

27   285 (D. Del. 2006), to exclude the plaintiff's survey.  After viewing a Nexium

28                                         -11-

advertisement, the survey asked the respondents which segment of the population they thought the product helped the most.  While 38% of respondents responding to the close-ended question (which gave three choices) identified the correct population, only 11% of the respondents were able to do so in response to an open-ended question. The court excluded the survey largely because "the closed-ended question responses are so lacking in reliability as to be effectively meaningless."  *Id.* at 292.

**D.  Dr. Hibbard's description of the range extender strays far from the record and inserts false premises from which no reliable conclusions can be drawn from the respondents' answers.**

Dr. Hibbard's five-sentence predicate departed from the record and included factually inaccurate statements.  Respondents who affirmed were, therefore, mistaken, and no conclusions can be drawn from their responses.  *See Centex Homes v. Lexington Ins. Co.*, 2016 U.S. Dist. LEXIS 188927, at *8 (C.D. Cal. Nov. 2, 2016) (quotation omitted) ("The premise being false, the conclusion falls.").

**1.  The check control message did not exist for 40% of the Class Period.**

Dr. Hibbard included a check control message in the description of the range extender, but BMW did not offer this feature until March 15, 2015, meaning that it did not exist for approximately 40% of the Class Period.  Any respondents who owned or leased before March 15, 2015, were, therefore, mistaken if they affirmed knowledge of Dr. Hibbard's description because it does not match their own cars.

**2.  The owner's manuals do not provide the critical information Dr. Hibbard includes on the defect.**

The owner's manual for Class members who owned or leased the 2014 model provides no information about the operation of the range extender.  Berman Reply Decl., Ex. 12.  BMW did not make its owner's manuals available on its website, and by its own estimation, only 4.7% of Class members reviewed owner's manuals before purchasing or leasing Class Cars.  Isaacson Report, ¶ 68 Table J; Gaskin Rebuttal, ¶ 16 n.22.  Yet Dr. Hibbard based his description of the range extender on the description

-12-

found in the owner's manuals for the 2015 and 2016 model years.  Berman Reply Decl., Ex. 9 at 20:22-21:5.  These manuals state in relevant part:

> Range Extender is designed to enable further driving in situations, in which the purely electric range is not sufficient. E.g., the next charging station can be reached.  With a very low charge state of the high-voltage battery, the drive power is reduced on sharp uphill grades or at high speeds in order to allow further driving.  This avoids a complete discharge of the high-voltage battery.  A Check Control message indicates an upcoming reduction in drive power.  [Zarafian Decl., Ex. 14-15.]

Dr. Hibbard's description retained all but the second sentence from the owner's manuals, which he drastically altered.  Notably, the 2015 and 2016 owner's manuals do not mention any losses of speed.  They provide no information on the state of charge that activates the range extender, nor do they indicate the state of charge that causes the range extender to suddenly decrease speed.  They merely state:

> With a very low charge state of the high-voltage battery, the drive power is reduced on sharp uphill grades or at high speeds in order to allow further driving.  [*Id.*]

Inexplicably, Dr. Hibbard's description replaced that vague statement with the following assertions:

> The Range Extender activates when the battery state of charge is 6.5%.  If the battery state of charge drops below 2%, the drive power (vehicle speed) is reduced on sharp uphill grades or from high speeds down to 35-40 mph and limited to this maximum speed range to allow further driving. [Hubbard Report, ¶ 14.]

These assertions provide far more detailed information relating to the defect than can be found in any of the real-life owner's manuals, and add yet another level of uncertainty to Dr. Hibbard's results.

### 3.  BMW's own test results contradict Dr. Hibbard's representations about the range of speed and the purported intent behind the defect.

Not only does Dr. Hibbard's description far exceed the meager information provided in the owner's manuals, it also significantly altered the meaning of the subsequent sentence: "This is done to avoid a complete discharge of the high-voltage

-13-

battery."  Whereas in the owner's manuals, "this" refers generically to a reduction of power (whatever that might entail), Dr. Hibbard's description claims that dropping from "high speeds down to 35-40 mph" and limiting vehicle speed "to this maximum speed range" is "done to avoid a complete discharge of the high-voltage battery."  This description does not align with BMW's own testing, which shows not a maximum or minimum speed range, but a simple mechanism:  as long as the range extender produces less electrical energy than the car consumes, the car's speed will drop, and as soon as circumstances improve, it regains speed.  Class Cert. Br. at 5; Berman Decl., Ex. 9 at 1091 and 1093; Donahue Report at 4.  The range extender's forced reduction of vehicle speed occurs even when the cars still have gas in the tank, and thus happens independent of the mechanism by which the car ceases to drive when it runs out of fuel.  *See*, *e.g.*, Berman Reply Decl., Ex. 13.  Consequently, respondents who affirmed based on these false representations were mistaken.  Because we cannot know which respondents responded in error, all results are unreliable.

### 4.  Dr. Hibbard's results are counterintuitive because they show knowledge of the defect *decreasing* over time.

Generally, public knowledge of a defect increases over time as more information becomes available.  And it follows from that assumption that respondents with the latest model year cars would have the highest percentage of responses affirming knowledge and owners and lessees of earliest the model year cars would have the least.  That Dr. Hibbard's data shows the opposite trend—that 2014 owners and lessees have the highest percentage of respondents affirming knowledge and 2016 owners and lessees have the lowest—provides yet another reason to doubt the veracity of his data and results.  Both Dr. Hibbard's reckless insertion of demonstrably untrue statements and the inexplicable trend lines should give the Court pause before considering the survey.

-14-

**E.  The survey runs the serious risk of creating false memories by suggesting information that the respondents ostensibly should have known.**

Memories are notoriously susceptible to alteration and "may be covertly contaminated by suggestive influence," especially when specifically restrained by the interviewer.  Amy Trenary, Casenote and Comment, *State v Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U Colo. L. Rev. 1257, 1264 (2013); Joyce W. Lacy & Craig E. L. Stark, *The Neuroscience of Memory: Implications for the Courtroom*, 14 Nature Revs. Neurosci. 649, 657 (2013) ("Memory is imperfect and susceptible to distortion and loss.").  In light of these well-accepted limitations on memory, it is not surprising that Dr. Hibbard could not identify any literature that supported the premise of his survey; nor did he consult with any experts on the psychology of memory for purposes of designing his survey.  Berman Reply Decl., Ex. 9 at 12:1-7, 65:18-66:4.  And BMW provides no evidence demonstrating that Dr. Hibbard's methods for determining the state of Class members' prior product knowledge have been tested, subjected to peer review, are commonly accepted in the field, or have otherwise been scientifically validated.

At a minimum, questioning on past knowledge requires a design that significantly limits the questioner's influence, *e.g.*, a design that permits Class members to describe in their own terms what they knew about the range extender before purchasing or leasing and how they learned of it.  *See* Amina Memon, Christian Meissner & Joanne Fraser, *The Cognitive Interview: A meta-analytic review and study space analysis of the past 25 years*. *Psychology Public Policy and Law*, 16 PSYCH. PUB. POL. AND L. 340, 342 (2010).  The courts in *Negrete v. Allianz Life Ins. Co.*, 2013 U.S. Dist. LEXIS 176313, at *35-36 n.6 (C.D. Cal. Dec. 9, 2013), and *Iorio v. Allianz Life Ins. Co. of N. Am.*, 2008 U.S. Dist. LEXIS 118344 (S.D. Cal. July 8, 2008), excluded surveys similar to BMW's that purportedly surveyed what consumers' understood a product, on the grounds that the defendant unduly influenced the responses.

-15-

"People do not have perfect memories." 1 Trademark Surveys: A Litigator's Guide § 2.09. Survey "questions should not ask the respondent to recall specifics when only generalities will be remembered." *Id.* Yet Dr. Hibbard's critical question on Class knowledge violated this standard by requiring respondents—responding to a three-minute survey—to juggle at least five unique facts in assessing their answer. This inflates random error by forcing respondents to "guess because they do not understand the question." *1-800 Contacts*, 2010 U.S. Dist. LEXIS 132948, at \*24-25 (quoting Shari Seidman Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 248 (Fed. Judicial Ctr. 2d ed. 2000)). For example, the court in *Potts* excluded a survey, in part, because it posed "questions that were quite long and convoluted, making it unlikely that most respondents remembered the beginning of the question once the interviewer reached the end of the question and requested a response." 334 F. Supp. 2d at 1217 (quotations omitted). The Court should likewise exclude Dr. Hibbard's survey.

## F.      Dr. Hibbard did not guard against the natural tendency of yea-saying.

By formulating his question as a yes or no question, Dr. Hibbard invited "yea-saying," which is the tendency that respondents will agree to his vaguely formulated question, "Prior to purchasing or leasing your BMW i3 with Range Extender, were you aware or not aware that the Range Extender operates as described on the previous screen?" Dr. Hibbard claims to have addressed possible survey biases through his use of a test/control survey design, Hibbard Report, ¶ 24, but he did not.

"A control is designed to estimate the degree of background 'noise' or 'error' in the survey." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010). Typically, differences between the response rate generated by the control questions and the response rate generated by the test questions provide the known error rate for test/control surveys. *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 463 (E.D. Va. 2017). For example, "a properly constructed likelihood of trademark confusion survey

-16-

will isolate confusion arising specifically from the contested mark" by using a control

mark "that shares as many characteristics with the contested mark as possible, with the

key exception of the characteristic whose influence is being assessed." *Id.* (quotations

omitted).  After "discounting for confusion arising from the control, the survey can

measure net confusion" based on the difference between the results of the control and

the test groups. *Id*.  Courts routinely exclude surveys for failing to design an adequate

control or for failing to net out the response rate associated with the control. *See, e.g.*,

*THOIP*, 690 F. Supp. 2d at 240; *Valador*, 242 F. Supp. 3d at 464.  Dr. Hibbard failed to

design an adequate control.

> **1.    Dr. Hibbard's fantasy drone option does not provide an adequate
> control.**

Given Dr. Hibbard's experience with surveys in trademark cases, one would

expect that he would design his control questions as close as possible to his test

questions on Class knowledge and impact and then to net out the response rate generated

by control questions.  He did not.  Both control questions were stunningly inadequate.

His internal control question, intended to gauge the noise level of responses to the

question of Class knowledge, asked respondents to consider the following:

> The Drone Option comes with an unmanned drone which
> allows the driver to launch the drone to deliver information to
> the vehicle in areas where satellites are not available. The
> drone has also been programmed to fly ahead of the vehicle
> and provide images of traffic.  [Hibbard Report, ¶ 48.]

The survey then asked respondents if they knew of the fictitious "Drone Option," as

described, when they purchased or leased their cars.  Hibbard Report, ¶¶ 50-51.  This

control fails because almost no one would find it plausible.  Dr. Hibbard acknowledged

that he knew of no commercial drone services during the Class Period.  Berman Reply

Decl., Ex. 9 at 128:17-129:1.  He removed only one respondent for affirming awareness

of the Drone Option, and, inexplicably, Dr. Hibbard did not net out the results of this

question from his reported results of the test questions.  Berman Reply Decl., Ex. 9 at

-17-

143:13-25 ("A.  I formulated the drone option the additional control in both cells for a yea-saying related to awareness. Q.  But you made no adjustment to the results and in tabulating the awareness based on the response to the drone question?  I thought you testified to that just a few minutes ago. A.  No the adjustment I made was I removed people, that was the adjustment.  Anyone who had indicated they were aware of a drone option were removed. Q.  The one person? A.  Correct.").

### 2.    The London launch control question fails for numerous reasons.

Dr. Hibbard created a set of control questions, which ostensibly track the test questions on knowledge and impact, but they do not closely resemble the test questions. He provided the control group the following description of the launch of the BMW i3 in London, U.K.:

> The BMW i3 with Range Extender has been sold in London, UK since the first model was released in 2014. The initial network included 46 dealers who were equipped to both sell and service the BMW i3 with Range Extender.  Examples include dealers in Brighton, Bristol, Canterbury, Guildford, Glasgow, Leeds, Leicester, Liverpool, Manchester, Milton Keynes, Newcastle, Norwich, Preston, Reading, Sheffield and Warrington."  [Hibbard Report, ¶ 35.]

He then asked the control group, "Prior to purchasing or leasing your BMW i3 with Range Extender, were you aware or not aware that the BMW i3 with the Range Extender was sold in London as described on the previous screen?"  Presenting questions based on BMW i3 sales in the U.K. serves as a poor control because it generates less interest and attention than the test questions about the operation of the range extender.  Gaskin, Rebuttal, ¶ 61.

Like with his test questions, Dr. Hibbard also got his facts wrong when formulating his control question as a compound question.  His description begins by misstating the release date as 2014.  In fact, BMW's U.K. affiliate launched the BMW

i3 in November of 2013.[2]  He also formulated the predicate for the control questions as a compound question.  It began with a very general statement in the first sentence, ostensibly about London, and then added additional obscure details in the sentences that followed (e.g., that the initial network included 46 dealers, and the list of 16 cities where dealers were located).  This poorly worded description either introduced new error (if the intent was the London launch) or needless confusion (if Dr. Hibbard erroneously referred to London but wanted respondents to consider the whole U.K.).  These poorly designed and unartfully drafted control questions created unreliable results and provided an unreliable control because they are not sufficiently similar to Dr. Hibbard's test questions on knowledge and impact.  As such, they do not provide a reliable approximation of the survey's error rate.

Like Dr. Hibbard, the expert in *THOIP v. Walt Disney Co.*, provided an inadequate control.  In *THOIP*, the court excluded the survey in large part because the survey's control test, a shirt depicting the same Disney character image as an allegedly infringing shirt but without any words, was too dissimilar to the test shirts and, therefore, did not provide "a reliable indicator of consumer confusion."  690 F. Supp. 2d at 240-41.  The Court should follow *THOIP* and exclude Dr. Hibbard's survey for failing to provide an appropriate control to account for his survey's error rate.

### 3.    Dr. Hibbard failed to net out the error associated with the control in reaching his conclusions on the test question.

Even assuming that Dr. Hibbard's London launch question offered an adequate control (it did not), he failed to use his existing controls to estimate the percentage of yea-sayers and adjust his estimates of the test questions based on the results of the control question.  Given that Dr. Hibbard designed screening questions, in part, to eliminate people who work for an automobile manufacturer, dealer, or parts supplier

---

[2] *See The new BMW i3 94Ah*, https://www.press.bmwgroup.com/united-kingdom/article/detail/T0259612EN_GB/the-new-bmw-i3-94ah?language=en_GB.

-19-

from the survey, the likelihood that *any* of the 196 respondents to these control questions would know that there were 46 dealers in the U.K. in 2014 selling the BMW i3, and could, if asked, name 16 of these dealers, approaches zero.  Hibbard Survey, Screener Question J; Gaskin Rebuttal, ¶ 59.  Yet 34 out of the 196 control respondents (17%) claimed prior awareness of the facts asserted.  This suggests that respondents answered with only a superficial understanding, drawn from the first few sentences of the description, a problem that likely plagues the test respondents as well. These affirmative answers from the control and test groups alike do not reliably indicate whether the respondents actually were aware of the remaining details while taking the survey, or more importantly, whether they were aware of them at the time of purchase or lease. Gaskin Rebuttal, ¶ 60.

The standard use of such a control would be to subtract the percent of the control group answering "yes" to this question from the percent of the test group answering "yes" to awareness of the information in the REx description prior to purchase or lease. *See Valador*, 242 F. Supp. 3d at 464.  But for this critical question, Dr. Hibbard made no use of the control results whatever—he left the test results completely unaltered. Hibbard Report, n.4.  Notably, had he adjusted the results based on the control, his estimate of Class member knowledge would have been reduced to 43.6%.

Like Dr. Hibbard, the expert excluded in *Valador* did not use a control "to account for potential error, false positives, or background noise."  242 F. Supp. 3d at 464.  The court concluded that his conclusions were "unreliable" because he failed to adjust the test group's response rate by the amount of noise measured by an appropriate control. *Id.*  The Court should follow the *Valador* court and exclude Dr. Hibbard's survey for the same reason.

## V.   CONCLUSION

Dr. Hibbard's survey fails even the relaxed admissibility review on class certification. He provides no reliable basis for his conclusions about Class member

1   knowledge and materiality.   The Court should, therefore, disregard Dr. Hibbard's

2   testimony in support of BMW's opposition to class certification.

3

4   DATED: September 16, 2019                HAGENS BERMAN SOBOL SHAPIRO LLP

5

6   By: /s/ Steve W. Berman
         Steve W. Berman (pro hac vice)

7   Sean R. Matt (pro hac vice)
    Barbara A. Mahoney (pro hac vice)

8   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000

9   Seattle, WA  98101
    Telephone: (206) 623-7292

10  Facsimile: (206) 623-0594
    Email: steve@hbsslaw.com

11  Email: barbaram@hbsslaw.com

12  Christopher Pitoun (SBN 290235)
    HAGENS BERMAN SOBOL SHAPIRO LLP

13  301 North Lake Avenue, Suite 920
    Pasadena, CA 91101

14  Telephone:  (213) 330-7150
    Facsimile: (213) 330-7150

15  Email: christopherp@hbsslaw.com

16  *Interim Lead Counsel for Plaintiffs and the*

17  *Proposed Class*

18  Benjamin F. Johns (pro hac vice)
    Andrew W. Ferich (pro hac vice)

19  CHIMICLES & TIKELLIS LLP

20  361 West Lancaster Avenue
    Haverford, PA 19041

21  Telephone: (610) 642-8500
    Facsimile: (610) 649-3633

22  Email: bfj@chimicles.com
    Email: awf@chimicles.com

23

24  Jonathan A Michaels
    MLG AUTOMOTIVE LAW APLC

25  2801 West Coast Highway, Suite 370
    Newport, CA 92663

26  Telephone: (949) 527-6900
    Facsimile: (949) 581-6908

27  Email: jmichaels@mlgautomotivelaw.com

28                                -21-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hovanes Margarian (SBN 246359)
THE MARGARIAN LAW FIRM
801 N. Brand Blvd., Suite 210
Glendale, CA 91203
Telephone: (818) 553-1000
Email: hovanes@margarianlaw.com

*Additional Class Counsel*

-22-