**LEWIS BRISBOIS BISGAARD & SMITH LLP**
ERIC Y. KIZIRIAN, SB# 210584
  E-Mail: Eric.Kizirian@lewisbrisbois.com
ZOURIK ZARIFIAN, SB# 306368
  E-Mail: Zourik.Zarifian@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for Defendant, BMW OF NORTH AMERICA, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BARRY BRAVERMAN, HAKOP DEMIRCHYAN, JOEL GREEN, CHEVAY JONES, DR., GLYNDA ROBERSON, EDO TSOAR, PETER WEINSTEIN, THOMAS MUNK, PETER BERNARD, LAURENCE CURCIO, NAVEEN PARMESHWAR, ADEEL SIDDIQUI, CHARLES OLSEN, ROBERT DESATNIK, ERIC WONDERLEY, JOHN LINGSWEILER, STEVE RIDGES, and BRANDON REDMOND,<br><br>Plaintiffs,<br><br>vs.<br><br>BMW OF NORTH AMERICA, LLC, a Delaware Limited Liability Company and BMW AG, a corporation organized under the laws of Germany,<br><br>Defendants. | Case No. 8:16-cv-00966-TJH-PJW<br><br>**BMW OF NORTH AMERICA, LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF DR. JONATHAN HIBBARD**<br><br>Hearing Date: TBD<br>Time: UNDER SUBMISSION<br>Crtrm.: 9B<br>Judge: Hon. Terry J. Hatter, Jr. |

# TABLE OF CONTENTS

Page

I. Introduction .................................................................................................. 1

II. Legal Standard ............................................................................................. 4

III. Argument ..................................................................................................... 4

    A. Dr. Hibbard's Survey Is Well Suited For Determining Class Knowledge And Materiality Which Is Evidence That is Critically Important on Certification Under *Mazza*. ............................................... 4

    B. Dr. Hibbard's Survey, Like Most Surveys, Is Designed With A Compound Stimulus Followed By Non-Compound Questions .............. 8

    C. Dr. Hibbard Conducted A Pre-Test For His Survey. ............................. 9

    D. Plaintiffs' Attack On The Premises Underlying Dr. Hibbard's Disclosure Of The Range Extender Are Misdirection. ......................... 11

        1. The Check Control Message Was Available On All Cars By Way of a Software Update. .................................................. 11

        2. Knowledge of the Range Extender Function Did Not Decrease Over Time, But Rather Stayed Proportional .............. 12

    E. Dr. Hibbard's Survey Contains Adequate Control Measures ............... 13

IV. Conclusion ................................................................................................. 15



# TABLE OF AUTHORITIES

Cases

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
   738 F.3d 960 (9th Cir. 2013) ................................................................................ 4

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
   2006 U.S. Dist. LEXIS 97200 (C.D. Cal. Mar. 2, 2006) ..................................... 3

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................................. 4

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*,
   618 F.3d 1025 (9th Cir. 2010) ............................................................................. 3

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015) ........................................................................ 3

*Kennedy v. Collagen Corp.*,
   161 F.3d 1226 (9th Cir. 1998) ............................................................................. 4

*Potts v. Hamilton*,
   334 F. Supp. 2d 1206 (E.D. Cal. 2004) .......................................................... 7, 8

*Mazza v. American Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................... 1



## I. INTRODUCTION

Plaintiffs' Motion to Exclude the Opinions of BMW of North America, LLC's ("BMW NA") expert, Dr. Jonathan Hibbard ("Motion" or "Mot."), is a desperate attempt to avoid *unrebutted* class member survey evidence that is damning to Plaintiffs' certification bid. The Ninth Circuit in *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) unambiguously held under highly analogous facts that no class may be certified where, as here, the evidence shows putative class members' exposure to and pre-purchase knowledge of allegedly "omitted" information varied. Dr. Hibbard's unrebutted survey supplies this precise evidence since it conclusively shows that Plaintiffs' and their experts' foundational and evidence-free *assumptions* of non-disclosure and classwide ignorance are grossly unfounded. Indeed, in their zeal to exclude Dr. Hibbard, Plaintiffs make a stunning admission that torpedoes these foundational assumptions that are the bedrocks of Plaintiffs' certification motion. They admit:

> "***public knowledge of a defect increases over time as more information becomes available.…***"

(Mot. at 14:16-18). This is *exactly* what Dr. Hibbard's survey shows—that putative class members were *not* uniformly ignorant of how the REx functions and did not find the allegedly omitted information material to their decision-making. Simply put, Dr. Hibbard's survey evidence, coupled with *Mazza*'s binding guidance, requires Plaintiffs' certification motion be denied. And because Plaintiffs have no rebuttal evidence on putative class members' claimed *lack* of knowledge of Power Reduction (their motion is built entirely on evidence-free *assumptions*), this Motion is a transparent and unsupported effort to salvage their far-fetched certification bid.

The substantive arguments in Plaintiffs' motion to exclude Dr. Hibbard do not help them. Indeed, Plaintiffs' motion is precisely the type of motion that district courts in the Ninth Circuit routinely deny. This is because *all* of the arguments Plaintiffs advance *at best* go to the weight and not the admissibility of the expert's

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

survey findings. Indeed, the Motion all but admits that it seeks extraordinary relief, contrary to the weight of authority in this circuit, when it recognizes that expert challenges like Plaintiffs' are often given short shrift by courts. (Mot. at 2:3-4, 7:15-17). Although styled as a *Daubert* based motion, Plaintiffs nowhere challenge Dr. Hibbard's qualifications as a survey design expert. Rather, they direct their criticisms at various aspects of Dr. Hibbard's survey by misconstruing key survey characteristics. For instance, Plaintiffs repeatedly and erroneously claim the survey presents compound questions when in reality, the *questions* in the survey are very simple and straightforward. In reality, Plaintiffs' primary contention is the survey's pre-question *disclosure* statement about the BMW i3's Range Extender is compound. This effort to conflate the pre-question survey disclosure and with simple post-disclosure questions permeates a majority of the arguments Plaintiffs advance to attack Dr. Hibbard's survey results.

The Motion's other arguments are also misleading and proceed on fictional grounds that are unsupported by the record. For example, Plaintiffs maintain Dr. Hibbard did not conduct a pre-test for his survey. Yet the record shows Dr. Hibbard's survey was pre-tested (by way of a "soft launch") using standard methodology. Plaintiffs also direct several subjective arguments at the survey's *design*, none of which have any bearing on admissibility. Even *if* credited, Plaintiffs' arguments at best are claims as to what *weight* a finder of fact should assign to Dr. Hibbard's findings. The Motion admits as much. (*See*, *e.g.*, Mot. at 2:3-4) ("Plaintiffs recognize that most survey criticisms go to weight and not admissibility").

Unlike Plaintiffs' expert, Steven P. Gaskin, who used the wrong tool altogether (*i.e.*, a conjoint survey) and faulty assumptions of classwide ignorance that even Mr. Gaskin admits could materially impact the reliability of his findings (*see* Dkt. 153, 167), Dr. Hibbard made no such fatal mistake. His consumer survey (like most surveys) showed respondents a brief paragraph statement about a feature

in the vehicle they leased or purchased, and followed up with two very straightforward and simple questions that tested knowledge and materiality. Respondents even had the option to click on a link and view the brief paragraph disclosure again after each question and had the option to select the "I don't know" option if they truly did not understand a question or know the answer. The survey also contained adequate control measures, which included a "London" control question and a "Drone" condition to guard against yea-saying.

In short, Dr. Hibbard's survey contains all the necessary hallmarks for an *admissible* survey. Plaintiffs know this, which is why they quibble with the most benign imperfections of his survey to avoid facing the harsh reality that most consumers (1) knew about the purported Range Extender "defect" in their i3 REx *prior* to purchasing or leasing their vehicle, or (2) did not know about the alleged Range Extender "defect," but would have still purchased or leased their i3 even if they knew of it. Plaintiff's dissatisfaction with the survey results is not a basis for survey exclusion. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1038 (9th Cir. 2010) ("criticisms, valid as they may be, go to 'issues of methodology, survey design, reliability, . . . [and] critique of conclusions,' and therefore 'go to the weight of the survey rather than its admissibility.'") (citations omitted). This Court should apply the same standard many other district Courts in this Circuit have applied when evaluating a plaintiff's motion to exclude expert opinions, and deny Plaintiffs' Motion.[1]

---

[1] *See, e.g.*, *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 179 (N.D. Cal. 2015) (denying plaintiffs' motion to exclude the opinions of defendant's expert and holding that "however inartfully presented, Dr. Hyun's report is sufficiently relevant and reliable to be admissible for the very limited purpose for which Defendants seek to use it"); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 2006 U.S. Dist. LEXIS 97200, at *13-14 (C.D. Cal. Mar. 2, 2006) ("any deficiencies in the survey's methodology are properly addressed by cross-examination at trial rather than outright exclusion. The jury should be permitted to assess the survey's reliability for itself.").



## II. LEGAL STANDARD

Under *Daubert v. Merrell Dow Pharmaceuticals* and its progeny, evaluating the admissibility of an expert's report consists of assessing the expert's "reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Expert testimony is relevant if "the knowledge underlying it has a valid connection to the pertinent inquiry[] [a]nd it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969.

Importantly, the Ninth Circuit has held that this Court "is supposed to screen the jury from unreliable *nonsense* opinions, but not exclude opinions merely because they are impeachable." *Id.* at 969 (9th Cir. 2013) (emphasis added). That is, the Court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70. And "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (citation omitted).

## III. ARGUMENT

### A. Dr. Hibbard's Survey Is Well Suited For Determining Class Knowledge And Materiality Which Is Evidence That is Critically Important on Certification Under *Mazza*.

Plaintiffs' arguments that Dr. Hibbard's survey is not suited for determining class knowledge and the impact of nondisclosure (Mot. Sec. II.A.) are wrong. Their claims run afoul of generally accepted survey standards and contradict Plaintiffs' ancillary arguments and cited authority.

Plaintiffs first argue Dr. Hibbard's survey is flawed because he "did not ask respondents whether they knew that the range extender decelerates *abruptly* with a sudden and *terrifying* loss in speed…" (Mot. at 3:4-6) (emphasis added). But this is merely *Plaintiff's* argumentative theory of liability in this case. It is not a neutral fact that is to be surveyed. Indeed, this subjective and emotionally charged description of the Range Extender is entirely inconsistent with an <u>*objective*</u> survey disclosure. To take Plaintiffs' reasoning to its logical end would require a survey about disclosures on a cigarette box, for example, to say that "cigarettes cause *terrifying* birth defects" instead of simply stating that "cigarettes cause birth defects." A self-serving disclosure of the Range Extender using extreme words such as "abruptly" and "terrifying" is not necessary to conduct a proper survey. In fact, if the statement were written in an argumentative manner that *favors* BMW NA (for example, "the range extender safety and comfortably slows down the vehicle"), Plaintiffs no doubt would challenge the characterization for not being objective.

Plaintiffs' second argument—that Dr. Hibbard "did not let respondents report their memories in their own terms, through open-ended questions" (Mot. at 3:9-15) and that the survey thus "runs the serious risk of creating false memories" (Mot., Sec. IV.E.)—is equally unavailing. First, Plaintiffs' own cited authority confirms that "[a]n open-ended question [is] not required to create a valid survey question" and in fact may make "interpreting the survey results more difficult." *1-800 Contacts, Inc. v. Lens.com, Inc. ("1-800 Contacts")*, 2010 U.S. Dist. LEXIS 132948, at *23 (D. Utah Dec. 15, 2010). That is why the survey in *1-800 Contacts* gave respondents the option of choosing between "yes," "no," or "don't know." *Id.* Those are the *same* options Dr. Hibbard gave respondents for Question No. 3, and an even wider array of choices for Question No. 4. (Dkt. 152-21, Expert Report of Dr. Jonathan D. Hibbard ("Hibbard Report") ¶¶ 38-39, 43-44). Moreover, the notion that Dr. Hibbard's failure to ask open-ended questions purportedly led to "suggesting or contaminating memories" (Mot. at 3:9-11) flies in the face of

Plaintiffs' own subsequent arguments that consumer memories are untrustworthy due to the risk of importing later memories into earlier ones. (*See* Mot. Sec. IV.E.). Ultimately, the use of close-ended questions versus open-ended questions is not a novel survey method and does not compromise Dr. Hibbard's survey results.[2] And it certainly is not a criticism that challenges the *admissibility* of Dr. Hibbard's survey results.

Although Plaintiffs reference the issue of "false memories," the crux of their argument is that respondents allegedly did not *understand* the survey questions. (*See* Mot. at 16:5-9) ("This inflates random error by forcing respondents to 'guess because they do not understand the question.'"); (*see also id.* at 16:9-13) ("the court in *Potts* excluded a survey, in part, because it posed 'questions that were quite long and convoluted…'"). This line of reasoning and authority confuses the survey *stimulus* (here, the *pre-question* disclosure statement consumers were asked to read) with the simple and straight-forward survey *questions*. Indeed, although Dr. Hibbard's survey consists of a brief multi-part disclosure that is a common attribute of most surveys (including the conjoint survey of Plaintiffs' own expert, Mr. Gaskin), Dr. Hibbard's actual survey questions that follow this disclosure and test knowledge and materiality are each discrete and simple questions that no consumer would find long, convoluted, or difficult to understand. (Hibbard Report ¶¶ 14-15, 38, 43).[3] Indeed, the cases cited in the Motion, which *actually* contained long,

---

[2] Plaintiffs set a double standard by arguing the "responses to Dr. Hibbard's rare, open-ended questions strongly suggest that his respondents did not read the critical information relating to the defect." (Mot. Sec. IV.C.). Plaintiffs cannot have it both ways. Several of the responses to the open-ended questions, which Plaintiffs label a "discrepancy" (Mot. at 11:25), only highlight the fact that respondents who thought information was immaterial or unimportant to them have no reason or motivation to expound on their lack of interest or concern for the information.

[3] Question 3 asked respondents, "Prior to purchasing or leasing your BMW i3 with Range Extender, were you aware or not aware that the Range Extender operates as described on the previous screen?" Question 4 asked respondents, "If (footnote continued)

convoluted, and confusing survey questions, are *nothing* like the *questions* in Dr. Hibbard's survey and serve to establish the simplicity of Dr. Hibbard's survey questions. (*See* Mot. at 16:9-13) (citing *Potts v. Hamilton*, 334 F. Supp. 2d 1206, 1217 (E.D. Cal. 2004).[4]

In short, Plaintiffs' challenge Dr. Hibbard's disclosure statement from their glass house—Mr. Gaskin's attribute descriptions in his conjoint survey are *twice* if not *three times* the length of the description Dr. Hibbard included in his survey. Plaintiffs' motion simply evidences their disbelief that respondents are capable of comprehending a brief paragraph about a prominent feature in the i3 they leased or purchased. Yet Dr. Hibbard's survey asks that respondents affirm they (1) in fact read the disclosure paragraph, and (2) voluntarily chose not to select "I don't know," which was an option respondents were repeatedly encouraged to select if they did not understand the question or know the answer. Again, plaintiffs' understandable dissatisfaction with the results of Dr. Hibbard's survey is no reason to exclude his survey findings.

//

---

you had known prior to your purchase or lease that the Range Extender option functions according to the description you read, would this information have changed or not changed your decision to purchase or lease your BMW i3 with Range Extender?" (Hibbard Report ¶¶ 38, 43). Neither of these questions are long or convoluted. Their reference to the brief stimulus or disclosure about the Range Extender also does not make them long, convoluted, or difficult to understand, especially because respondents had the choice to "Click [on a link] to see the description again." (*Id.*).

[4] In *Potts*, the court cited the following as an example of a long and convoluted question in the survey at issue, which stands in stark contrast to Dr. Hibbard's survey questions here: "If a dentist promoted himself or herself as a fellow of the American Academy of Implant Dentistry and has achieved the distinction of diplomate of the American Board of Oral Implantology through successful completion of experiential, educational and testing requirements, would you consider that dentist to be a specialist in implant dentistry?" *Potts*, 334 F. Supp. 2d at 1217 n.9.

### B. Dr. Hibbard's Survey, Like Most Surveys, Is Designed With A Compound Stimulus Followed By Non-Compound Questions.

Plaintiffs' self-created confusion between the survey *disclosure* and the survey *questions* also puts an end to their argument that Dr. Hibbard asked "compound questions." While the Motion repeatedly uses the term "compound question," Plaintiffs make clear references only to the survey *disclosure*, which was not a question at all. Indeed, a cursory review of the actual *questions* Dr. Hibbard asked demonstrate they are not compound. The questions Dr. Hibbard asked are:

> Prior to purchasing or leasing your BMW i3 with Range Extender, were you aware or not aware that the Range Extender operates as described on the previous screen?

> If you had known prior to your purchase or lease that the Range Extender option functions according to the description you read, would this information have changed or not changed your decision to purchase or lease your BMW i3 with Range Extender?

(Hibbard Report ¶¶ 38, 43). To the extent Plaintiffs' argument is that the *disclosure* is compound, that argument is without merit. It is commonly accepted that a survey should realistically simulate the marketplace as closely as possible. And Dr. Hibbard's disclosure about the Range Extender to respondents closely mimics how information is transmitted to consumers in the marketplace since product descriptions are never artificially parsed-out unrelated sentences. (*Id.* ¶ 34). Indeed, virtually *all* marketing surveys are presented this way. For example, surveys routinely involve showing consumers "compound" stimuli (*e.g.*, television commercials, product images, packaging images, multi-word phrases or descriptions) and then ask simple and non-compound *questions* about memories, perceptions, or attitudes relating to the stimulus the consumer was shown. This "real world" process is precisely what Dr. Hibbard's survey replicates. (*See* Hibbard Report ¶¶ 34, 38, 43).

/ / /

Plaintiffs' complaint that Dr. Hibbard did not ask "respondents to affirm or deny each of the five factual assertions [in the REx description] separately" (Mot. at 3:21-24) is nonsensical. Indeed, applying this logic to surveys in other scenarios using different stimuli demonstrates the absurdity of Plaintiffs' proposition: a survey testing a commercial ad would not be shown to respondents one frame at a time with pictorial elements disaggregated; a survey involving a product package or trade dress would not be shown to respondents with materials and elements decomposed; a survey involving a website would not be shown to respondents with only a small portion of the website; and a survey involving a trademark would not show and test a word mark one letter at a time. Plaintiffs contradict themselves by arguing that a paragraph stimulus cannot be assessed with a single question when they brag about their "highly sophisticated conjoint survey" (Mot. at 2:16-17) since a conjoint study, including the one Mr. Gaskin prepared for this case, presents a paragraph or more worth of information and then asks for a single response (*i.e.*, a choice). Thus, even *Plaintiffs'* experts would understand the proper presentation of a stimulus involves simulating the compound nature of the stimulus rather than showing an artificially decomposed version of it.

**C.    Dr. Hibbard Conducted A Pre-Test For His Survey.**

Plaintiffs' claim that Dr. Hibbard did not pre-test his survey questions is misleading. Dr. Hibbard made clear that he did a "soft launch" as a pre-test for this survey:

> Q: How did you conduct the pretesting in this case? Sorry. First question, did you – you did conduct pretesting this case, is that correct?
>
> A: I did what we call a soft launch, so maybe about 25 people, respondents took the survey and then typically you pause it and you look through the responses to make sure that the questions seem to be understood and if there's open ends that the verbatim seem to be that they're understanding questions.

Hibbard Depo., p. 44:3-13; *see also* Hibbard Report, Ex. D. Thus, the claim that Dr.

Hibbard did not attempt to ensure the survey was understandable is demonstrably false. What Dr. Hibbard did not do is "***directly query*** any of the respondents [after the soft launch as to] whether they understood all of the questions." *Id.* at 44:14-17. That Dr. Hibbard did not directly contact participants in the soft launch to later interview them does not mean that he didn't "pre-test" his survey at all. As Dr. Hibbard stated, "[i]n the studies I reviewed, both as an expert and consulting expert, I have never seen somebody say ***I did a pretest and I then contacted the respondents to discuss it with them***." *Id.* at 45:4-8. Thus, the issue is not, as Plaintiffs claim, whether Dr. Hibbard conducted a "pre-test." Rather, the issue is whether his decision to contact survey respondents *after* the soft-launch is a fatal error in his survey.

The answer to this now properly framed issue is clearly no. This is because even *if* Dr. Hibbard had not pre-tested his survey (he did), Plaintiffs readily admit that "[b]y itself, [Dr. Hibbard's] failure to pretest may not serve as grounds for exclusion[.]" They nonetheless devote an entire section to argue Dr. Hibbard failed to pre-test his survey questions. (Mot. Sec. IV.B.).

In addition, Dr. Hibbard clearly indicated in his "Quality Control and Validation Measures" that "[t]he survey was pre-tested." (Hibbard Report, Ex. D). Specifically, "[b]efore starting the full survey, a small number of surveys were conducted online and the data were examined to ensure that the data were being recorded and coded properly, that the survey skip patterns were being followed accurately, and that responses demonstrated an understanding of the questions." (*Id.*). This is a standard pre-test methodology and Dr. Hibbard used it in his survey study.

In short, Plaintiffs' pre-test based attacks of Dr. Hibbard's survey are yet another example of their dissatisfaction with the results of the survey. Their arguments provide no basis to exclude the survey altogether. Plaintiffs provide no substantive allegations—and they certainly do not cite any evidence or authority—to

demonstrate Dr. Hibbard's survey questions were unclear such that a pre-test would have yielded different results. Nor can they since Dr. Hibbard used simple questions to assess consumer awareness and materiality of the Range Extender and monitored and inspected the data during sample collection. There being no problems with the sample collection, Dr. Hibbard continued collecting the data that formed the basis of his report.

### D. Plaintiffs' Attack On The Premises Underlying Dr. Hibbard's Disclosure Of The Range Extender Are Misdirection.

Equally without merit is Plaintiffs' contention that the disclosure Dr. Hibbard provided to respondents about the Range Extender contained "false premises." (Mot. Sec. IV.D.). First, Plaintiffs' critiques regarding the premises underlying the Range Extender disclosure are disputes of fact that go to the *credibility* of the survey findings rather than an attack on the *validity* of the survey as a whole. Indeed, the following two examples show Plaintiffs' arguments are misleading because they crumble under the weight of the actual record.

#### 1. *The Check Control Message Was Available On All Cars By Way of a Software Update.*

Plaintiffs complain the last sentence of the Range Extender disclosure in the survey, which provides that "[a] Check Control message in the car's performance display indicates an upcoming reduction in drive power" (Hibbard Report ¶ 34), did not exist for 40% of the Class Period. (Mot. Sec. IV.D.1.). This is false. While the check control message was not initially available on 2014 and early 2015 model year i3 REx vehicles, it was available on all vehicles sold *after* March 15, 2015 and was also made available on **all vehicles** – including those vehicles sold *before* March 15, 2015 – by way of a software update. Thus, *all* putative class vehicles did in fact have the check control message that Plaintiffs claim was not in all cars. The motion does not cite any fact to the contrary.

Moreover, given the 9-state data set contained 144 respondents who had a 2015 model year i3 and 42 respondents who had a 2016 model year i3 that likely did

have the check control message at issue, the survey results would not be materially different even *if* the 2014 model year cars did not also have the same check control message through the software update BMW provided. The Motion ignores both of these critical facts.

### 2. *Knowledge of the Range Extender Function Did Not Decrease Over Time, But Rather Stayed Proportional.*

According to Plaintiffs, "public knowledge of a defect increases over time as more information become available[,] [so] it follows from that assumption that respondents with the latest model year cars would have the highest percentage of responses affirming knowledge and owners and lessees of earlie[r] model year cars would have the least." (Mot. at 14:16-20). **_This statement proves too much and is an admission that no class can be certified here._** If Plaintiffs' premise is correct, and public knowledge of an alleged defect must increase over time, *how can a class be certified here on Plaintiffs' threshold and foundational assumption of classwide ignorance of how the REx functions throughout the class period?* By their own admission, materiality and knowledge are not "common" among class members – a fact that Dr. Hibbard's survey abundantly supports! Under the facts of this case and under *Mazza*'s binding authority, a common assumption of classwide ignorance and materiality as to the alleged omission that is central Plaintiff's case cannot be used to certify a class here.

Moreover, even if this admission were not dispositive of Plaintiffs' certification request (it is), their claim that "Dr. Hibbard's data shows the opposite trend—that 2014 owners and lessees have the highest percentage of respondents affirming knowledge and 2016 owners and lessees have the lowest" is plain false. (Mot. at 14:19-23). Plaintiffs irresponsibly ignore basic statistics by making this claim. To be sure, the 2014, 2015, and 2016 data indicates awareness counts were 42/64, 67/111, and 18/31, respectively, for a total of 127/206. (*See* Hibbard Report ¶ 57, Table A). A 3-sample test for equality of proportions without continuity

correction returns a chi-square value of .67 and a p-value of .71. The null cannot be rejected since .71 exceeds the 95% confidence criterion of .05. In other words, <u>*the proportions of awareness among the years are not different from one another*</u>.

### E. Dr. Hibbard's Survey Contains Adequate Control Measures.

Plaintiffs fare no better with their final argument that Dr. Hibbard "did not guard against the natural tendency of yea-saying." (Mot. Sec. IV.F.). First, they incorrectly contend Dr. Hibbard's survey consisted of only a "yes or no question." (Mot. at 16:16). A review of the available survey responses clearly shows respondents were provided with more than these two options. For example, in response to Question No. 3, which was intended to test respondents' awareness of the Range Extender's operation, respondents were able to choose between the following *three* options:

> Yes, prior to purchasing or leasing my BMW i3 with Range Extender, I <u>was aware</u> that the Range Extender operates as described on the previous screen.
>
> No, prior to purchasing or leasing my BMW i3 with Range Extender, I <u>was not aware</u> that the Range Extender operates as described on the previous screen.
>
> I don't know.

(Hibbard Report ¶ 39). And for Question No. 4, which was intended to test the materiality of the Range Extender's function to respondents' lease or purchase, respondents were able to choose between the following *six* options:

> Definitely would have changed my decision to purchase or lease the BMW i3 with Range Extender.
>
> Probably would have changed my decision to purchase or lease the BMW i3 with Range Extender.
>
> May or may not have changed my decision to purchase or lease the BMW i3 with Range Extender.

> Probably would <u>not</u> have changed my decision to purchase or lease the BMW i3 with Range Extender.
>
> Definitely would <u>not</u> have changed my decision to purchase or lease the BMW i3 with Range Extender.
>
> I don't know if it would have changed my decision to purchase or lease the BMW i3 with Range Extender.

(*Id.* ¶ 44). Critically, Plaintiffs ignore that an "I don't know" option was available in both survey questions in the Test Cell *and* the Control Cell, and that such an option is a standard and "internal control" for yea-saying.

Second, Plaintiffs argue "Dr. Hibbard's fantasy drone option does not provide an adequate control" (Mot. Sec. IV.F.1.) because "almost no one would find it plausible." (*Id.* at 17:22-24). This argument is devoid of any scientific merit. Indeed, the fact that the Drone Option is obviously false is precisely why it is an ideal control for yea-saying. Plaintiffs' only support for their bizarre argument is that only one respondent affirmed awareness of the Drone Option. (Mot. at 17:25-27). But the fact that only one person affirmed awareness of this condition is also consistent with the fact that Dr. Hibbard's survey yielded almost zero margin of error on class knowledge. Not surprisingly, Plaintiffs ignore this alternative explanation. (*See* Mot. Sec. IV.F.1.).

Finally, Plaintiffs nitpick at the construction of Dr. Hibbard's London control group question, arguing it fails for numerous reasons. (Mot. Sec. IV.F.2.). For the reasons already discussed, arguments like these have no bearing on the *admissibility* of Dr. Hibbard's survey, but rather go to the weight and credibility of his findings. Even still, Plaintiffs' entire argument is premised on an incorrect understanding of the purpose and function of control cells in a survey, as shown by their misguided belief that the London question is intended to quantify noise in the measure of awareness. It is not. Rather, it is intended to quantify noise in the measure of *materiality*. To that end, since the London information was factual, respondents

who responded they are aware were not making an "error" in reporting their awareness.

## IV. CONCLUSION

Plaintiffs' Motion to Exclude the opinions of BMW NA's proposed expert, Dr. Jonathan Hibbard, should be denied.

DATED: November 20, 2019　　　LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _____
Eric Y. Kizirian
Attorneys for Defendant BMW OF NORTH AMERICA, LLC