1   Steve W. Berman (*pro hac vice*)
      *steve@hbsslaw.com*
2   Barbara A. Mahoney (*pro hac vice*)
      *barbaram@hbsslaw.com*
3   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
4   Seattle, WA 98101
    Telephone: (206) 623-7292
5   Facsimile: (206) 623-0594

6   Christopher Pitoun (SBN 290235)
      *christopherp@hbsslaw.com*
7   HAGENS BERMAN SOBOL SHAPIRO LLP
    301 North Lake Avenue, Suite 920
8   Pasadena, CA 91101
    Telephone: (213) 330-7150
9   Facsimile: (213) 330-7152

10
11  *Interim Lead Counsel for Plaintiffs and*
    *the Proposed Class*

12  *[Additional Counsel on Signature Page]*

13
14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17  BARRY BRAVERMAN, *et al.*,          No. 8:16-cv-00966-TJH-SS

18                    Plaintiffs,       **PLAINTIFFS' REPLY IN**
                                        **SUPPORT OF MOTION TO**
18                                      **EXCLUDE THE OPINIONS**
19          v.                          **OF DEFENDANTS' PROPOSED**
                                        **EXPERT, DR. JONATHAN**
19  BMW OF NORTH AMERICA, LLC,          **HIBBARD**
20  *et al.*,
21
22                    Defendants.       Hearing Date: TBD
                                        Time: TBD
23                                      Judge: Hon. Terry J. Hatter, Jr.
                                        Courtroom: 9B
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... II

I. INTRODUCTION .......................................................................................... 1

II. ARGUMENT ................................................................................................. 2

    A. The Court should disregard the results of Dr. Hibbard's survey because it is not probative of Plaintiffs' ability to prove their case on a class-wide basis.................................................. 2

    B. Even for class certification purposes, Dr. Hibbard's proffered testimony falls below the minimal standards of expert reliability. ..................................................................... 4

        1. The Court must consider *Daubert* reliability standards when considering a challenged expert for purposes of class certification. ................................................................ 4

        2. Dr. Hibbard's reliance on a compound question to probe class member knowledge of the defect makes it impossible to conclude whether respondents affirmed knowledge of the range extender function in general or specific to the defect. ............................................. 5

        3. By including factually inaccurate information in his description of the range extender, Dr. Hibbard guaranteed that no reliable conclusions could be drawn from his survey. ............................................ 8

        4. Dr. Hibbard's survey is unreliable because it does not merely survey class members' memories of past knowledge, it suggests false memories......................... 9

        5. By burying information critical to the defect, Dr. Hibbard increased the risk that respondents would affirm prior knowledge of the range extender function without necessarily noting the disclosure of the defect............... 11

        6. The absence of appropriate controls further negates the reliability of Dr. Hibbard's so-called "controlled study." ....................................................................... 12

    C. BMW's criticisms of Plaintiffs' conjoint survey are unsupported. .......................................................................... 14

III. CONCLUSION .............................................................................................. 16

-i-

1

2

**TABLE OF AUTHORITIES**

3

<u>Page(s)</u>

4

CASES

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  2010 U.S. Dist. LEXIS 132948 (D. Utah Dec. 15, 2010) ............................ 7, 10, 14

*In re Arris Cable Modem Consumer Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018) ........................................................................ 15

*AstraZeneca LP v. TAP Pharm. Prods.*,
  444 F. Supp. 2d 278 (D. Del. 2006) .................................................................. 8, 10

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
  2006 U.S. Dist. LEXIS 97200 (C.D. Cal. Mar. 2, 2006) ........................................ 4

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................................ 15

*Dickey v. Advanced Micro Devices, Inc.*,
  2019 U.S. Dist. LEXIS 8740 (N.D. Cal. Jan. 17, 2019) ..................................... 3, 4

*Escobar v. Just Born, Inc.*,
  2019 U.S. Dist. LEXIS 167841 (C.D. Cal. June 19, 2019)..................................... 4

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*,
  618 F.3d 1025 (9th Cir. 2010) ................................................................................ 4

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018).................................................................. 15

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
  305 F.R.D. 164 (N.D. Cal. 2015) ............................................................................ 5

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226 (9th Cir. 1998) ................................................................................. 5

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................................... 1, 3

*Potts v. Hamilton*,
  334 F. Supp. 2d 1206, 1217 (E.D. Cal. 2004) ................................................ 5, 6, 11

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-ii-

*Sali v. Corona Reg'l Med. Ctr.*,
  889 F.3d 623 (9th Cir. 2018) ................................................................. 4

*Schechner v. Whirlpool Corp.*,
  2019 U.S. Dist. LEXIS 171642 (E.D. Mich. Aug. 13, 2019) ............................. 15

## OTHER AUTHORITIES

16 PSYCH. PUB. POL. & L. 340 (2010) .......................................................... 10

010616-11/1212152 V2

# I.   INTRODUCTION

BMW has not articulated any legitimate basis for the Court to consider Dr. Hibbard's proffered expert testimony.  It contends that the evidence he offers on class member knowledge of the defect and its materiality to them would assist the Court's predominance assessment under *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), by helping the Court to identify variation in class members' exposure to the allegedly omitted information and its materiality to their decision to purchase or lease Class Cars.  Dkt. No. 181 ("BMW's Hibbard Opp'n"), at 4-5.  As discussed in more detail in Section II.A, BMW is wrong for two reasons.  *First*, class claims do not require individualized findings of deception or reliance, so the Court has no need to consider Dr. Hibbard's evidence for purposes of determining whether individual issues predominate over common ones.  *Second*, there is no variation in exposure to the deceptive conduct: BMW had an equal opportunity to reveal its defect (but did not) to all class members when they entered into purchase or lease agreements with BMW's authorized dealers, making Hibbard's opinion irrelevant.

BMW also claims that Plaintiffs' objections to Dr. Hibbard's survey merely go to the weight of his testimony without reaching the reliability standards under *Daubert*.  BMW's Hibbard Opp'n at 1-2.  This is also incorrect.  Plaintiffs lay out several, compelling reasons why Dr. Hibbard's hollow testimony does not satisfy even the relaxed *Daubert* standards of reliability at class certification.  For a start, none of the conclusions he draws on class knowledge and reliability are logically supportable.  All of his evidence on class knowledge (and by implication his evidence on materiality) rests on survey responses to a five-part compound question about the range extender, from which it is impossible to determine whether respondents intended to affirm knowledge of the defect or of other information he provided about the range extender (*see* Section II.B.2).  Dr. Hibbard also draws invalid conclusions from survey responses that incorrectly affirmed knowledge of his description of the range extender that

-1-

included demonstrably false information, such as the presence of a warning light that did not exist for respondents who purchased or leased Class Cars in the first 40% of the Class Period (*see* Section II.B.3).  For another, Dr. Hibbard's survey suggests false memories to survey respondents by presenting incomplete and partly inaccurate information about the range extender to them on one screen and then asking them on a second screen to affirm or deny that they knew that information two to three years earlier (*see* Section II.B.4).  His so-called "controlled study" not only does not control for distractions and inattention (*see* Section II.B.6), it trades on them by burying the crucial disclosure of the defect in the third of a five-sentence description, where respondents of the three-minute survey may not fully take it in (*see* Section II.B.5).  Finally, BMW draws a false equivalence between Dr. Hibbard's uniquely flawed survey on knowledge and Plaintiffs' entirely unrelated conjoint analysis of consumer preferences.  Unlike Dr. Hibbard's survey, Plaintiffs' conjoint analysis does not ask survey respondents to affirm or deny factual assertions, but rather it offers them choice sets and then uses their selections as the foundation for its statistical analysis of consumer preferences (*see* Section III).

## II.   ARGUMENT

**A.    The Court should disregard the results of Dr. Hibbard's survey because it is not probative of Plaintiffs' ability to prove their case on a class-wide basis.**

For all the reasons just outlined, BMW's proffered expert on class knowledge fails to meet *Daubert* reliability standards.  But to resolve this motion, the Court need not evaluate Dr. Hibbard's reliability because BMW has not even met the first hurdle of persuading the Court that *any* evidence of class member knowledge or materiality would substantially advance the Court's evaluation of Plaintiffs' class certification motion.  BMW cannot meet this burden because class claims do not require individualized evidence of deception or reliance.  *See* Dkt. Nos. 171 (sealed) & 123-3 (public) ("Class Cert. Br."), at 16 & 16 n.76; Dkt. Nos. 173 (sealed) & 162-3 (public) ("Class Cert. Reply") at 3-5; 17-21.  The central question driving resolution of this case is whether a

-2-

1    reasonable person would find BMW's omission deceptive.  Evidence tending to prove

2    or disprove actual class member deception only goes to the strength of the deception

3    claim.  It does not raise any issues that would require the jury to make individualized

4    findings of fact or otherwise support BMW's objections to class certification.

5         BMW's only argument for the relevance of class member knowledge and

6    materiality relies on an incorrect interpretation of *Mazza v. Am. Honda Motor Co., Inc.*,

7    666 F.3d 581 (9th Cir. 2012).  For purposes of evaluating class members' deceptive

8    omission claims, *Mazza* does not, as BMW claims, require the Court to consider

9    variation among class members' knowledge of the defect or materiality.  BMW's

10   Hibbard Opp'n at 1.  Instead it merely requires the Court to restrict class membership

11   to individuals who were exposed to, and therefore could have relied to their detriment

12   on, BMW's deceptive omission.  666 F.3d at 596.  Plaintiffs meet this requirement

13   because they restrict class membership to consumers who purchased or leased from

14   authorized BMW dealers, to whom BMW expressly entrusted its duty to disclose the

15   alleged defect.  Class Cert. Reply at 5-6.

16        Remarkably, BMW does not address *Dickey v. Advanced Micro Devices, Inc.*,

17   2019 U.S. Dist. LEXIS 8740 (N.D. Cal. Jan. 17, 2019), discussed in prior briefing (Class

18   Cert. Reply at 15), which rejected the very arguments BMW raises here in support of

19   Dr. Hibbard.  The *Dickey* court likewise considered certification of deceptive marketing

20   claims, which did not require individualized proof of deception or reliance.  The critical

21   issue was whether the defendant's marketing of its central processing unit as "8-core"

22   was objectively deceptive as to the number of core processors.  The court found the

23   defense expert's survey on consumer expectations of the number of core processors in

24   the defendant's component not worthy of consideration because it related only to the

25   merits of the case and not its suitability for class treatment.  *Id.* at *12-13.  Here, too,

26   evidence of class members' alleged knowledge and the materiality of the defect goes to

27   the merits, not the suitability of the class.

28

-3-

BMW also implicitly argues that Dr. Hibbard's testimony is relevant for the Court's consideration of class members' exposure to third-party sources of information about Class Cars (BMW's Hibbard Opp'n at 1), an argument that the *Dickey* court also rejected. The core question of the deceptive nature of the defendant's conduct remains common to all class members as long as they were exposed to the same conduct. The court concluded that the third-party exposure argument merely "repurposed" the previous argument, *i.e.*, both relate only to the individual impact of the defendant's conduct, which the plaintiffs did not need to prove, making it unnecessary for the Court to consider individual differences in class members' exposure to third-party information sources. 2019 U.S. Dist. LEXIS 8740, at *15-16.

Likewise, in *Escobar v. Just Born, Inc.* (where BMW's counsel is counsel of record), this Court observed that "expert analysis" purporting to show that some or even "the majority of the public was not actually misled or deceived" is immaterial because the Court's class certification analysis does not permit it "to engage in free-ranging merits inquiries at this juncture." 2019 U.S. Dist. LEXIS 167841, at *4-5 (C.D. Cal. June 19, 2019) (quotation omitted). For the same reasons articulated by the *Dickey* court and by this Court in *Escobar*, the Court should also decline to consider Dr. Hibbard's purported expert evidence of class knowledge in this case.

**B.    Even for class certification purposes, Dr. Hibbard's proffered testimony falls below the minimal standards of expert reliability.**

**1.    The Court must consider *Daubert* reliability standards when considering a challenged expert for purposes of class certification.**

BMW makes light of its evidentiary burden, but class certification review does not "dispense with the standards of admissibility entirely." *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 634 (9th Cir. 2018). None of the cases BMW discusses authorizes the Court to entertain a survey with *incurably* unreliable results. BMW's Hibbard Opp'n at 3-4. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1038 (9th Cir. 2010) and *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 2006

-4-

U.S. Dist. LEXIS 97200, at *10 (C.D. Cal. Mar. 2, 2006) only permit surveys if "they are conducted according to accepted principles." Even Dr. Hibbard acknowledges that as a standard practice, surveys do not permit compound questions. Dkt. No. 164-6 ("Hibbard Dep."), at 42:2-43:15. *Potts v. Hamilton*, holds that such surveys are incurably unreliable because "compound questions . . . mak[e] it *impossible* to determine which element the respondent addressed in his or her response." 334 F. Supp. 2d 1206, 1217 (E.D. Cal. 2004) (emphasis added). And Plaintiffs identified several other equally serious deficiencies with Dr. Hibbard's survey that generate incurably unreliable survey results.

BMW's out-of-context quotation from *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164 (N.D. Cal. 2015), does not justify the Court's consideration of an improperly designed and unreliable survey. In the part of the decision quoted by BMW, the *Kamakahi* court found that an ethical opinion "however inartfully presented" for the relevant purpose of understanding the factors that physicians would consider if the challenged guideline did not exist, could be considered for that purpose at class certification. *Id.* at 178-79. *Kamakahi* does not apply here because BMW does not even attempt to argue that the Court could rely on Dr. Hibbard's survey for any evidentiary purpose other than class member knowledge or materiality. *Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998), also does not help BMW. The issue there was whether the court had considered all the reasoning and methodologies the expert relied on in linking the defendant's drug to the plaintiff's illness. *Id.* at 1231. But BMW has not identified any additional or overlooked reasoning or methodologies that could resuscitate Dr. Hibbard's invalid conclusions.

**2.  Dr. Hibbard's reliance on a compound question to probe class member knowledge of the defect makes it impossible to conclude whether respondents affirmed knowledge of the range extender function in general or specific to the defect.**

The most obvious deficiency in Dr. Hibbard's survey is that he poses the question on knowledge as a compound question. *See* Dkt. Nos. 175 (sealed) & 162-4 (public)

-5-

("Plaintiffs' Hibbard Mot."), at 8-9.  BMW does not disagree that survey results based on a compound question are inadmissible because of the impossibility of determining which component the respondent meant to affirm or deny.  *Potts*, 334 F. Supp. 2d at 1217.  BMW also does not seek to distinguish the other authorities Plaintiffs cite for this proposition.  Plaintiffs' Hibbard Mot. at 8-9.  Instead, while admitting that Dr. Hibbard's question on knowledge has a "compound stimulus," BMW denies that his question is compound.  BMW's Hibbard Opp'n at 8-9.  Not surprisingly, BMW gets this wrong.

Dr. Hibbard presented the question over two screens.  The first screen contains Dr. Hibbard's five-sentence description of the range extender.  Only the third sentence relates to Plaintiffs' allegations of defective performance (*i.e.*, sudden deceleration).  The subsequent screen asks: "Prior to purchasing or leasing your BMW i3 with Range Extender, were you aware or not aware that the Range Extender operates as described on the previous screen?"  The five-sentence description on the first screen serves as the predicate of a closed (*i.e.*, multiple choice) question presented on the second screen, to which respondents may only answer: "yes," "no," or "I don't know."  Dkt. No. 152-21 ("Hibbard Report"), ¶¶ 14-15, 38-39; BMW's Hibbard Opp'n at 8.  Because Dr. Hibbard does not ask respondents to respond separately for each assertion contained in his description of the range extender, it is impossible to know which assertion or assertions the respondent affirmed.  As a matter of logic and mathematics, there are 32 possible interpretations to a compound question with five components.  Plaintiffs' Hibbard Mot. at 9. Critically, there is no reliable way of knowing whether the responses affirmed knowledge of the range extender's defective performance, or just its general operation.

Tellingly, while BMW claims that this question follows the same design as many other product surveys, it does not provide a single example of a survey that mirrors Dr. Hibbard's question on class knowledge.  BMW's Hibbard Opp'n at 8.  BMW's shaky analogy to surveys in trade dress cases, which it describes as a concurrent display of multiple images, *id.*, fails because such surveys solicit opinions on likeness.  This is

-6-

1   demonstratively different from Dr. Hibbard's question on knowledge, which demands

2   that the respondent make a factual admission, without clarifying whether the admission

3   addresses any or all of the factual predicates.

4          As discussed in Plaintiffs' opening briefing, the court in *1-800 Contacts, Inc. v.*

5   *Lens.com, Inc.*, 2010 U.S. Dist. LEXIS 132948 (D. Utah Dec. 15, 2010) excluded a

6   survey for several reasons, including that the ambiguity of the central substantive

7   question produced no reliable results and that a compound question to qualify

8   respondents left open the possibility that the wrong survey population had been selected.

9   *Id.* at *25-27; Plaintiffs' Hibbard Mot. at 8, 9, 11, & 16.  BMW does not address either

10  holding, but it does acknowledge that the structure of Dr. Hibbard's two-part knowledge

11  question largely resembles the substantive question the court deemed too ambiguous to

12  produce reliable results.  BMW's Hibbard Opp'n at 5.  The central substantive question

13  in *1-800 Contacts*, was "Do you think that the link marked with the asterisk (*)

14  originates from 1-800-CONTACTS?" and, much like the respondents to Dr. Hibbard's

15  survey, the respondents had the option of choosing "yes," "no," or "don't know."  *1-*

16  *800 Contacts, Inc.*, 2010 U.S. Dist. LEXIS 132948, at *23; BMW's Hibbard Opp'n at

17  5.   The ambiguity in that case arose from the previous screen, which informed

18  respondents that the search term was "1800contacts" and that the next screen would

19  show the results of that search.   The court found the survey unreliable because

20  respondents could reasonably have responded "yes," when asked if the highlighted link

21  "originates from 1-800-CONTACTS," without understanding that the question actually

22  referred to the company itself and not the company name used as a search term.  *Id.* at

23  *25.  Like the respondents in *1-800 Contacts*, Hibbard's survey respondents could easily

24  have responded yes to the knowledge question, if they recalled some of the information

25  included in his description but not the information relating to defective performance.

26  Dr. Hibbard's conclusion that all respondents who answered in the affirmative knew

27

28

PLFS' REPLY ISO MOTION TO EXCLUDE THE OPINIONS OF DEFENDANTS' PROPOSED EXPERT,
DR. JONATHAN HIBBARD

1    about the defect is logically invalid and incurably unreliable because his survey did not

2    create any other record, from which to decipher their intent.

3            This flaw also directly impacts the reliability of his conclusion that for 88.1% of

4    Class members the defect did not materially affect their decision to lease or buy Class

5    Cars. Plaintiffs' opening brief discussed several ways, in which this occurred that BMW

6    does not attempt to address.  Plaintiffs' Hibbard Mot. at 6, 11-12.  *First*, Dr. Hibbard

7    did not ask any respondents whether it was the defect that mattered, as opposed to the

8    operation of the range extender as he described it.  Hibbard Report, ¶ 62.  *Second*, he

9    assumed that the defect was immaterial to all respondents, who affirmed knowledge of

10   the information he provided. Only respondents who denied or did not know whether

11   they had prior knowledge, were offered a close-ended (multiple choice) question on

12   materiality and a subsequent open-ended question to explain their response (which

13   Hibbard ignores in drawing his conclusion on materiality).  *Id.  Third*, his conclusion

14   relies on responses to the close-ended question that the information probably or

15   definitively would not have affected their decision, but neither he nor BMW provide a

16   rationale for the fact that only 30% of these respondents provided an explanation that

17   reflected an understanding of the defect. Plaintiffs' Hibbard Mot. at 6, 11-12; Hibbard

18   Dep. at 196:22-197:7.  And *fourth*, BMW does not even address *AstraZeneca LP v. TAP*

19   *Pharm. Prods.*, 444 F. Supp. 2d 278 (D. Del. 2006), which excluded a survey based on

20   inconsistent results between the open-ended and close-ended responses.  Plaintiffs'

21   Hibbard Mot. at 11-12.

22           **3.      By including factually inaccurate information in his description of the
23                     range extender, Dr. Hibbard guaranteed that no reliable conclusions
                       could be drawn from his survey.**

24           The five-sentence predicate to the question on knowledge also included

25   information that would have been objectively false for many of the respondents.

26   Specifically, Dr. Hibbard's description of the range extender included a check control

27   function (*i.e.*, a warning light and sound that notified the driver when the range extender

28

-8-

was about to reduce the car's speed) that did not exist for at least 40% of the Class Period.  Hibbard Report, ¶ 14; Plaintiffs' Hibbard Mot. at 12; BMW's Hibbard Opp'n at 11.  Affirmative responses from those, who purchased or leased their cars before this feature became available are false and obviously cannot be relied upon.

BMW oddly disputes that the information was false for these respondents because BMW eventually made the check control function available to all cars through a software update.  BMW's Hibbard Opp'n at 11.  But what matters for purposes of Dr. Hibbard's survey is the reliability of respondents' memory. If their cars did not, in fact, have this feature at the time of purchase or lease, their recollection is false.  That some respondents may have affirmed prior knowledge based on a subsequent software update supports Plaintiffs, not BMW, by illustrating the folly of using a survey of memories to establish class members' prior states of knowledge in the first place.

BMW also badly miscalculates the disastrous consequences of this incurable design flaw, which are not limited to the affirmative responses of the respondents who owned or leased the 2014 model.  BMW's Hibbard Opp'n at 11-12.  Because Dr. Hibbard did not ask respondents when they purchased or leased their cars, Hibbard Report, Ex. C, and the check control function did not become available until months after the 2015 models entered the market, none of the 109 affirmative responses on knowledge from any owners or lessees of the 2014 and 2015 models can be relied upon. BMW's Hibbard Opp'n at 11-12.  This spares only the 18 affirmative responses from the owners or lessees of the 2016 model—and their responses are unreliable for the additional reasons argued.

**4. Dr. Hibbard's survey is unreliable because it does not merely survey class members' memories of past knowledge, it suggests false memories.**

Witness psychology warns against suggestive questions that will create false memories—as Dr. Hibbard's survey evidently did in the case of respondents who purported to remember a car feature that did not exist at the time they purchased or

-9-

leased.  To prevent tainting memories, psychologists recommend questions that will allow the witness to control the narrative.  *See, e.g.*, Amina Memon, Christian Meissner & Joanne Fraser, *The Cognitive Interview: A meta-analytic review and study space analysis of the past 25 years. Psychology Public Policy and Law*, 16 PSYCH. PUB. POL. AND L. 340, 342 (2010); *see also* Plaintiffs' Hibbard Mot. at 15-16 (discussing additional authorities).  In the context of a survey, open-ended questions, which provide no pre-set answers, are more conducive to eliciting untainted memories, as opposed to a close-ended (*i.e.*, multiple choice) questions, which offer pre-set answers.  *Id.*  Dr. Hibbard designed his survey directly contrary to these recommendations, by presenting a five-sentence paragraph to respondents on one screen and then asking them on a second screen to affirm or deny that they had possession of that information two to three years earlier.  *Id.*

At his deposition Dr. Hibbard could not identify any literature that supported his approach to surveying past knowledge.  Hibbard Dep. at 65:18-66:4.  In its opposition brief, BMW relies solely on *1-800 Contacts* for the proposition that that "[a]n open-ended question [is] not required to create a valid survey question."  2010 U.S. Dist. LEXIS 132948, at *23.  BMW's Hibbard Opp'n at 5.  But the court made this observation in the context of reviewing a conventional opinion (likeness) survey, and not, as BMW intends it, as a justification to use close-ended questions in an attempted survey of past knowledge.  BMW also does not distinguish *AstraZeneca LP v. TAP Pharm. Prods.*, 444 F. Supp. 2d 278 (D. Del. 2006), discussed in Plaintiffs' opening brief, where the court found the responses to the open-ended questions more reliable and excluded a survey precisely because the responses to the close-ended responses did not align with them.  Plaintiffs' Hibbard Mot. at 11-12.

By focusing solely on Plaintiffs' objection to close-ended questions, it ignores the larger objection to Dr. Hibbard's technique of asking respondents to review a set of statements and then asking in a follow-up question whether they had known at the time

-10-

of purchase or lease the information they had just read.  BMW's Hibbard Opp'n at 5-6; Plaintiffs' Hibbard Mot. at 15-16.  As a matter of common sense, if describing the range extender function on one screen runs the risk of planting false memories (as it evidently does), posing the follow-up question on the next screen, whether as an open-ended or a close-ended question, does nothing to cure that defect.

BMW also wrongly accuses Plaintiffs of applying a "double standard" when they point out that Dr. Hibbard's five-sentence representation of the range extender function runs both the risk of suggesting false memories and the risk of distracting respondents from reading the description all the way through before responding.  BMW's Hibbard Opp'n at 6.  This is not a double standard.  Both arguments stem from Plaintiffs' overarching objection to the reliability of a survey of memories.

**5.   By burying information critical to the defect, Dr. Hibbard increased the risk that respondents would affirm prior knowledge of the range extender function without necessarily noting the disclosure of the defect.**

Dr. Hibbard's description of the range extender never revealed the critical fact that when the range extender causes Class Cars to decelerate from highway speeds to roughly 35-40 mph, it does so *without triggering the brake lights*, a condition that Plaintiffs justifiably describe as "terrifying."  Dkt. Nos. 174-1 (sealed) & Dkt. 162-9 (public) ("Olczak Dep."), at 295:21-22.  But the crucial point is not that Dr. Hibbard failed to embrace the term "terrifying" to describe this experience or even that he failed to include all relevant facts relating to the defect, but that he buried the only information relating to the defect (sudden deceleration) in the third of a five-sentence description. Plaintiffs' Hibbard Mot. at 6. This essentially guaranteed that some respondents, rushing through Dr. Hibbard's three-minute survey, would fail to notice it, an inference supported by the relatively few respondents, who mentioned speed reduction in their open-ended responses on materiality.  Plaintiffs' Hibbard Mot. at 11-12.  This placement of information relevant to the defect, in the third of five sentences, makes Dr. Hibbard's question far more misleading than the question that the *Potts* court highlighted in its

-11-

order excluding survey evidence.  334 F. Supp. 2d at 1217 n.9 ("If a dentist promoted himself or herself as a fellow of the American Academy of Implant Dentistry and has achieved the distinction of diplomate of the American Board of Oral Implantology through successful completion of experiential, educational and testing requirements, would you consider that dentist to be a specialist in implant dentistry?"); BMW's Hibbard Opp'n at 6-7.

Nor are Plaintiffs arguing from a "glass house."  BMW's Hibbard Opp'n at 7. Dr. Hibbard's survey attempts to establish a record of class member knowledge of the defect by directly asking respondents to confirm or deny prior familiarity with a description of the range extender that included an allegation about the defect.  The structure of his question, including its length and the placement of information relevant to the defect bears directly on his survey's ability to reliably capture class members' memory of their prior knowledge.  In contrast, Plaintiffs' conjoint survey is a widely accepted and reliable analytical method to measure the impact of deceptive omissions on consumer preferences.  Class Cert. Br. at 23; Dkt. Nos. 176 (sealed) & Dkt. 162-7 (public) ("Plaintiffs' Gaskin Opp'n "), at 3-4.  It calculates this impact through a statistical model generated from survey respondents' selection of choice sets provided by the survey. *Id.* The length of questions posed by Plaintiffs' conjoint survey is commensurate with its purpose and does not run the same risks as Dr. Hibbard's survey.

### 6. The absence of appropriate controls further negates the reliability of Dr. Hibbard's so-called "controlled study."

The purpose of a controlled study is to eliminate the influence of unintended variables that affect the reliability of the results, such as the tendency of survey respondents to submit an incorrect answer because they were distracted or responded without adequately attending to the question.  Appropriate controls allow the survey designer to measure the impact of these unintended influences on the respondents' responses and to adjust the survey results to account for them.  Plaintiffs' Hibbard Mot. at 16-17. Ideally, to accurately measure the error rate attributable to the unintended

-12-

influences, the designer would create control questions that generate the same level of interest that the target question does. *Id.* at 18. Notably, Dr. Hibbard does not intentionally control for the fallibility of respondents' memories, but his erroneous inclusion of the check control feature effectively serves that purpose by causing a large number of respondents to answer incorrectly, (Section II.B.3), setting up an extremely high and unacceptable error rate.

Dr. Hibbard implemented two controls: the Drone Option and the London Question. BMW's Hibbard Opp'n at 14. By BMW's own admission, the "Drone Option [control] is obviously false," *id.*, and like a dead give-away question on a quiz, it does not generate enough interest and attention to reliably control for distraction and inattentiveness. Instead the Drone Option provides an ideal foil for BMW's assertion that there was "almost zero margin of error" in his survey. *Id.* Dr. Hibbard's other control, the London Question, provides a similar foil. Both questions solicit obvious responses and require little attention to respond accurately, as opposed to the target questions on memories, which are much more error-prone. Consequently, his controls do not accurately estimate and control for the unintended influences on the survey responses. The "I don't know" choice likewise does not alleviate the tendency towards inattention or to answer hastily without full comprehension, and it obviously served as an inadequate control to prevent the many false answers to the target question on knowledge. *Id.*

Relatedly, one can also control for reliability by comparing the results with real-world expectations. Plaintiffs will not repeat here the extensive record showing the near absence of any public information of the defect during the Class Period that directly refutes Dr. Hibbard's extraordinary conclusion that 60.6% of the class members knew about it at the time of purchase or lease. Class Cert. Br. at 7-8; Class Cert. Reply at 6-12; Plaintiffs' Hibbard Mot. at 8-9. Instead, Plaintiffs focus on a single salient point. Specifically, one would anticipate that the longer a product exists in the market, the

-13-

more familiar the public becomes with it, warts and all.  Plaintiffs' Hibbard Mot. at 14.
BMW does not deny that owners or lessees of the 2014 models affirmed prior
knowledge of the information Dr. Hibbard provided in his survey at a higher rate than
owners and lessees of the 2015 model, who in turn affirmed at a higher rate than owners
and lessees of the 2016 model.  BMW's Hibbard Opp'n at 12.  It also does not deny that
taken at face value, these survey results show an unexpected stagnation of professed
knowledge.  *Id.* at 13.  In response, BMW merely argues that a *decline* in professed
knowledge is not statistically supported, *id.* at 12-13, but whether expressed as
stagnation or decline, Dr. Hibbard's results run directly contrary to an anticipated
*increase* in public knowledge, which BMW simply cannot account for.

Instead, by way of deflection, BMW disingenuously argues that by pointing out
this discrepancy in his data, Plaintiffs make "a stunning admission" about the record on
class knowledge.  *Id.* at 1.  Plaintiffs obviously make no concessions about the record
of class knowledge, nor are they required to establish "class-wide ignorance."  *Id.*

Finally, Dr. Hibbard conducted a soft launch, which consisted of confirming that
respondents' answers were recorded and loaded properly and that the survey questions
sequenced properly.  *Id.* at 9-10.  BMW argues that this qualifies as pre-testing, but
BMW makes Plaintiffs argument for them when it acknowledges that Dr. Hibbard did
not interview respondents to determine whether they understood his questions.  *Id.*; *see
also 1-800 Contacts*, 2010 U.S. Dist. LEXIS 132948, at *25 (criticizing the survey
expert for failing to pretest to uncover "unexpected question interpretation").  And it
does not deny that he could have avoided some of his serious survey flaws by doing so.
Plaintiffs' Hibbard Mot. at 10-11.

**C.      BMW's criticisms of Plaintiffs' conjoint survey are unsupported.**

In a transparent effort to deflect from the valid concerns raised about its own
expert by this motion, BMW broadly complains that Plaintiffs' expert "used the wrong
tool altogether (i.e., a conjoint survey) and [made] faulty assumptions of classwide

-14-

ignorance." BMW's Hibbard Opp'n at 2.  BMW is wrong on both counts.  Mr. Gaskin's conjoint survey does not operate under any assumptions of class member knowledge.  It is also the preferred method of measuring the market impact of a deceptive omission.

*Schechner v. Whirlpool Corp.*, 2019 U.S. Dist. LEXIS 171642 (E.D. Mich. Aug. 13, 2019), which BMW relies on heavily in its *Daubert* reply briefs[1] confirmed that the conjoint methodology that Mr. Gaskin also applies here, was admissible.  *Id.* at *19. But for reasons unrelated to the case here, the court concluded that it did not satisfy *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), because the survey coined a new marketing label ("Partial clean") for poorly performing, self-cleaning ovens, which does not exist in the actual marketplace of self-cleaning ovens and therefore could not reflect historical supply side factors for that market.  *Id.* at 21 n.7.  Plaintiffs' survey, which does not introduce any new and unfamiliar labels, is not vulnerable to that charge. BMW does not support its contention that the *Schechner* court would disapprove of Mr. Gaskin's treatment of car prices in the survey as manufacturer suggested retail prices (MSRPs),[2] by anything more than conjecture, and tellingly, BMW fails to acknowledge that Mr. Gaskin's survey relied on actual market prices for the Class Cars that prevailed during the Class Period and that he instructed respondents to treat the prices—as  they would treat MSRPs in real-life—as the starting point of any negotiations, discounts or federal or state credits.  Dkt. No. 125-32 ("Gaskin Report"), ¶¶ 21, 41.  Further, BMW ignores the many opinions in which courts rejected efforts to exclude conjoint surveys and otherwise relied on such surveys to certify classes.  *See, e.g., Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103-1111 (N.D. Cal. 2018); *In re Arris Cable Modem*

---

[1] Dkt. No. 168 ("BMW's Weir Reply"), at 1-5; Dkt. No. 167 ("BMW's Gaskin Reply"), at 1, 2, & 7. Plaintiffs had no earlier opportunity to address this decision because Lexis and Westlaw had not published it until after Plaintiffs filed their opposition briefs. *See* Declaration of Barbara A. Mahoney in Support of Plaintiff's Reply in Support of Motion to Exclude Opinions of Dr. Jonathan Hibbard and attachments (filed herewith).

[2] BMW's Gaskin Reply at 7; BMW's Weir Reply at 2.

*Consumer Litig.*, 327 F.R.D. 334, 370-74 (N.D. Cal. 2018); *see also* Plaintiffs' Gaskin

Opp'n at 13-14 (discussing numerous other decisions).

### III.   CONCLUSION

The Court should disregard Dr. Hibbard's unsubstantiated conclusions about

class member knowledge and materiality because this evidence has no bearing on

Plaintiffs' motion to certify claims that do not require proof of actual deception or

reliance.  The Court should also disregard it because even the relaxed evidential standard

at class certification does not permit consideration of junk science.

DATED: December 11, 2019              HAGENS BERMAN SOBOL SHAPIRO LLP


                                      By: */s/ Steve W. Berman*
                                         Steve W. Berman (*pro hac vice*)
                                      Barbara A. Mahoney (*pro hac vice*)
                                      HAGENS BERMAN SOBOL SHAPIRO LLP
                                      1301 Second Avenue, Suite 2000
                                      Seattle, WA  98101
                                      Telephone: (206) 623-7292
                                      Facsimile:  (206) 623-0594
                                      Email: steve@hbsslaw.com
                                      Email: barbaram@hbsslaw.com

                                      Christopher Pitoun (SBN 290235)
                                      HAGENS BERMAN SOBOL SHAPIRO LLP
                                      301 North Lake Avenue, Suite 920
                                      Pasadena, CA 91101
                                      Telephone: (213) 330-7150
                                      Facsimile:  (213) 330-7150
                                      Email: christopherp@hbsslaw.com

                                      *Interim Lead Counsel for Plaintiffs and the
                                      Proposed Class*

                                      Benjamin F. Johns (*pro hac vice*)
                                      Andrew W. Ferich (*pro hac vice*)
                                      CHIMICLES & TIKELLIS LLP
                                      361 West Lancaster Avenue
                                      Haverford, PA 19041
                                      Telephone: (610) 642-8500
                                      Facsimile:  (610) 649-3633
                                      Email: bfj@chimicles.com

-16-

Email: awf@chimicles.com

Jonathan A Michaels
MLG AUTOMOTIVE LAW APLC
600 Anton Blvd., Suite 1240
Costa Mesa, CA 92626
Telephone: (949) 527-6900
Facsimile:  (949) 581-6908
Email: jmichaels@mlgaplc.com

Hovanes Margarian (SBN 246359)
THE MARGARIAN LAW FIRM
801 N. Brand Blvd., Suite 210
Glendale, CA 91203
Telephone: (818) 553-1000
Email: hovanes@margarianlaw.com

*Additional Class Counsel*

-17-