1   Steve W. Berman (*pro hac vice*)
    *steve@hbsslaw.com*
2   Sean R. Matt (*pro hac vice*)
    *sean@hbsslaw.com*
3   Barbara A. Mahoney (*pro hac vice*)
    *barbaram@hbsslaw.com*
4   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
5   Seattle, WA 98101
    Telephone: (206) 623-7292
6   Facsimile: (206) 623-0594

7   *Interim Lead Counsel for Plaintiffs and*
    *the Proposed Class*
8
    [Additional Counsel on Signature Page]
9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

13   BARRY BRAVERMAN, *et al.*,          No. 8:16-cv-00966-TJH-PJW

14                   Plaintiffs,         **CALIFORNIA PLAINTIFFS'**
                                         **NOTICE OF MOTION AND**
15        vs.                            **PARTIAL RENEWED MOTION**
                                         **FOR CLASS CERTIFICATION**
16   BMW OF NORTH AMERICA, LLC,
     *et al.*,                           **[REDACTED VERSION OF**
17                                       **DOCUMENT PROPOSED TO BE**
                                         **FILED UNDER SEAL]**
18                   Defendants.
                                         Hearing Date: TBD
19                                       Time: TBD
                                         Judge: Hon. Terry J. Hatter, Jr.
20                                       Courtroom: 9C

21                                       [Filed with Declaration of Steve W.
                                         Berman and Proposed Order]
22

23

24

25

26

27

28

**TO ALL PARTIES AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on a date to be determined by the Court on or after November 9, 2020, in the Courtroom of the Hon. Terry J. Hatter, Jr., located at United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, Courtroom 9B, 9th Floor, Plaintiffs Barry Braverman, Hakop Demirchyan, Joel Green, Dr. Glynda Roberson, and Edo Tsoar ("California Plaintiffs"), will and hereby do, move for an order (a) certifying California Plaintiffs' putative class in this litigation; (b) appointing California Plaintiffs as class representatives; and (c) appointing Hagens Berman Sobol Shapiro LLP as Class Counsel. California Plaintiffs make this motion on the following grounds:

1. The court should certify under Fed. R. Civ. P. 23(a) and 23(b)(3) the following Class: All persons or entities who purchased or leased a new BMW i3 with Range Extender model-year 2014-2016 ("Class Cars") from an authorized BMW dealer on or before May 16, 2016, in California. Excluded from the Class are BMW North America and BMW AG, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and their subsidiaries and affiliates, BMW dealers, Class counsel and their employees, and the judicial officers and their immediate family members and associated court staff assigned to this case, all persons who make a timely election to be excluded from the Classes, and governmental entities.

2. The legal claims for which certification are sought are:

    a. Breach of implied warranty of merchantability under the Song-Beverly Act, Cal. Civ. Code §§ 1791.1 & 1792; and

    b. A derivative Magnuson-Moss claim for implied warranty of merchantability under 15 U.S.C. § 2301, *et seq.*

3. The Court has already determined that California Plaintiffs meet Rule 23(a) requirements to certify putative class claims for (1) breach of the implied warranty of

merchantability, under Song-Beverly, for Class Cars (defined as model year 2014-2016 BMW i3 RExs purchased or leased new on or before May 16, 2016) acquired in California; and (2) a derivative Magnuson-Moss claim for Class Cars acquired in California. Dkt. No. 185.

4.     The requirements of Rule 23(b)(3) are also met because common issues will predominate over individual ones, given that California Plaintiffs will use evidence common to all Class members to prove liability and damages. Further, class certification provides a superior method of adjudicating these claims because it would be grossly inefficient and uneconomical for Class members to proceed individually, and the case is manageable.

5.     The Court should appoint California Plaintiffs Barry Braverman, Hakop Demirchyan, Joel Green, Dr. Glynda Roberson, and Edo Tsoar as Class Representatives, having already determined that they meet all requirements under Rule 23(a).

6.     The Court should appoint Interim Lead Counsel Hagens Berman Sobol Shapiro LLP ("HBSS") as Class Counsel. The Court previously found that HBSS has "sufficient experience, commitment and resources to fairly, efficiently and economically' represent the interests of the class." Dkt. No. 34. HBSS has represented California Plaintiffs and the proposed Class since May 2016 and has continued to demonstrate its fitness and commitment to serve as Class Counsel. As Interim Lead Counsel, HBSS has briefed and argued Plaintiffs' oppositions to BMW's motion to dismiss, briefed Plaintiffs' original motion for class certification, and expended significant time and resources on behalf of the claims of California Class members.

This motion is made following the telephonic conference of counsel pursuant to Local Rule 7-3, which took place on May 29, 2020.

This motion is based on this notice of motion, the accompanying memorandum of points and authorities, the Declaration of Steve W. Berman in Support of California

1   Plaintiffs' Partial Renewed Motion for Class Certification, any further briefs submitted

2   by Plaintiffs, and any oral argument permitted by the Court.

3

4   DATED: July 6, 2020                     HAGENS BERMAN SOBOL SHAPIRO LLP

5                                           By: */s/ Steve W. Berman*
                                                Steve W. Berman (*pro hac vice*)
6                                            Sean R. Matt (*pro hac vice*)
                                             Barbara A. Mahoney (*pro hac vice*)
7                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                             1301 Second Avenue, Suite 2000
8                                            Seattle, WA 98101
                                             Telephone: (206) 623-7292
9                                            Facsimile: (206) 623-0594
                                             Email: steve@hbsslaw.com
10                                           Email: sean@hbsslaw.com
                                             Email: barbaram@hbsslaw.com
11

12                                           Christopher Pitoun (SBN 290235)
13                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                             301 North Lake Avenue, Suite 920
14                                           Pasadena, CA 91101
                                             Telephone: (213) 330-7150
15                                           Facsimile: (213) 330-7150
                                             Email: christopherp@hbsslaw.com
16

17                                           *Interim Lead Counsel for Plaintiffs and the
                                             Proposed Class*
18

19                                           Benjamin F. Johns (*pro hac vice*)
                                             Andrew W. Ferich (*pro hac vice*)
20                                           CHIMICLES SCHWARTZ KRINER
                                             & DONALDSON-SMITH LLP
21                                           361 West Lancaster Avenue
                                             Haverford, PA 19041
22                                           Telephone: (610) 642-8500
                                             Facsimile: (610) 649-3633
23                                           Email: bfj@chimicles.com
                                             Email: awf@chimicles.com
24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonathan A Michaels
MLG AUTOMOTIVE LAW APLC
2801 West Coast Highway, Suite 370
Newport, CA 92663
Telephone: (949) 527-6900
Facsimile: (949) 581-6908
Email: jmichaels@mlgautomotivelaw.com

*Plaintiffs' Executive Committee*

Hovanes Margarian (SBN 246359)
THE MARGARIAN LAW FIRM
801 N. Brand Blvd., Suite 210
Glendale, CA 91203
Telephone: (818) 553-1000
Email: hovanes@margarianlaw.com

*Additional Plaintiffs' Counsel*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.   PROFFER OF EVIDENCE COMMON TO THE CLASS .............................. 1

   A.   Class Cars have a common design defect that causes them to decelerate suddenly and rapidly. ............................................................ 1

   B.   BMW had an available fix but did not repair Class Cars. ...................... 7

   C.   The undisclosed defect inflated Class Cars' market price. ...................... 8

III.   ARGUMENT ...................................................................................... 12

   A.   Common issues predominate Class members' implied warranty claims. .................................................................................. 13

      1.   Proof that Class Cars' Range Extender is defective will not vary amongst Class members. ........................................ 14

      2.   Common evidence demonstrates that the defectively designed Range Extender presents safety concerns that render all Class Cars unmerchantable. ......................................... 17

      3.   California Plaintiffs can prove causal injury on a class-wide basis .......................................................................... 18

      4.   California Plaintiffs propose a reliable class damages model consistent with their theories of liability. ......................... 21

   B.   A class action is a superior method of adjudicating this dispute. .............................................................................................. 22

   C.   The Court should appoint Interim Lead Counsel as Class Counsel. ............................................................................................. 24

IV.   CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abdullah v. U.S. Sec. Assocs. Inc.*,
   731 F.3d 952 (9th Cir. 2013) ............................................................................. 13

*Alger v. FCA US LLC*,
   334 F.R.D. 415 (E.D. Cal. 2020) ................................................................. 15, 16

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................ 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ............................................................................................ 13

*In re Apple iPhone 3G Prods. Liab. Litig.*,
   728 F. Supp. 2d 1065 (N.D. Cal. 2010) ............................................................. 13

*Asghari v. Volkswagen Grp. of Am., Inc.*,
   2015 U.S. Dist. LEXIS 188824 (C.D. Cal. May 29, 2015) ................................ 15

*Banks v. Nissan N. Am., Inc.*,
   301 F.R.D. 327 (N.D. Cal. 2013) ....................................................................... 15

*Chamberlan v. Ford Motor Co.*,
   223 F.R.D. 524 (N.D. Cal. 2004) ....................................................................... 15

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................................. 21

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................................. 20

*Deutsch Hollandische Tabakgesellschaft mBH & Co., KG v.
   Trendsettah USA, Inc.*,
   2018 WL 4849707 (C.D. Cal. Jul. 31, 2018) .......................................... 14, 18, 20

*Escobar v. Just Born, Inc.*,
   2019 U.S. Dist. LEXIS 165971 (C.D. Cal. June 19, 2019) ................................ 21

*Falco v. Nissan N. Am., Inc.*,
   2016 U.S. Dist. LEXIS 46115 (C.D. Cal. Apr. 5, 2016) .................................... 15

*Gonzalez-Tzita v. City of L.A.*,
  2019 U.S. Dist. LEXIS 226410 (C.D. Cal. Dec. 9, 2019)............................23, 24

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018).................................................................19

*Hudock v. LG Elecs. U.S.A., Inc.*,
  2020 U.S. Dist. LEXIS 54994 (D. Minn. Mar. 30, 2020)..................................19

*Huu Nguyen v. Nissan N. Am., Inc.*,
  932 F.3d 811 (9th Cir. 2019) .......................................................................15, 22

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019) ..............................................................................19

*Kearney v. Hyundai Motor Am.*,
  2012 U.S. Dist. LEXIS 200327 (C.D. Cal. Dec. 17, 2012)..............................15

*Keegan v. Am. Honda Motor Co.*,
  284 F.R.D. 504 (C.D. Cal. 2012)..................................................................15, 16

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ..........................................................................24

*Krommenhock v. Post Foods, LLC*,
  2020 U.S. Dist. LEXIS 40463 (N.D. Cal. Mar. 9, 2020)..................................19

*Local Jt. Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas
  Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ............................................................................13

*Marmont v. Bernzomatic Corp.*,
  2018 U.S. Dist. LEXIS 227401 (C.D. Cal. July 31, 2018) ...............................19

*McKenzie v. Fed. Express Corp.*,
  275 F.R.D. 290 (C.D. Cal. 2011)........................................................................23

*Milligan v. Toyota Motor Sales, U.S.A., Inc.*,
  2012 U.S. Dist. LEXIS 189782 (N.D. Cal. Jan. 9, 2012) .................................15

*In re MyFord Touch Consumer Litig.*,
  2016 U.S. Dist. LEXIS 1794876 (N.D. Cal. Sept. 14, 2016)................15, 17, 20

-vii-

*Parkinson v. Hyundai Motor Am.*,
   258 F.R.D. 580 (C.D. Cal. 2008)........................................................15

*In re Qualcomm Antitrust Litig.*,
   328 F.R.D. 280 (N.D. Cal. 2018) .....................................................24

*Rosenbaum v. Toyota Motor Sales, U.S., Inc.*,
   2016 U.S. Dist. LEXIS 193377 (E.D. Mich. Nov. 28, 2016) ...........14

*Salas v. Toyota Motor Sales, U.S., Inc.*,
   2019 U.S. Dist. LEXIS 77847 (C.D. Cal. Mar. 27, 2019) ..........15, 16

*Sanchez-Knutson v. Ford Motor Co.*,
   2016 U.S. Dist. LEXIS 123237 (S.D. Fla. July 11, 2016) ................19

*Sloan v. GM LLC*,
   2020 U.S. Dist. LEXIS 71982 (N.D. Cal. Apr. 23, 2020)..........*passim*

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016)..........................................................13, 16, 18

*Victorino v. FCA US LLC*,
   2019 U.S. Dist. LEXIS 180112 (S.D. Cal. Oct. 17, 2019)................15

*Victorino v. FCA US LLC*,
   326 F.R.D. 282 (S.D. Cal. 2018) .....................................................14

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ...................................................15, 16

*Zakaria v. Gerber Prods. Co.*,
   2016 U.S. Dist. LEXIS 184861 (C.D. Cal. Mar. 23, 2016) ..............14

### STATUTES

15 U.S.C. § 2301(7)................................................................................13

Cal. Civ. Code § 1791.1..........................................................................14

Cal. Civ. Code § 1792.............................................................................14

Cal. Civ. Code § 1792.3..........................................................................18

Cal. Civ. Code § 1792.4..........................................................................18

Cal. Civ. Code § 1794(2) .......................................................................... 14

Cal. Civ. Code § 1794(b)(2) ..................................................................... 22

Cal. Com. Code § 2714(2) ................................................................. 14, 22

CALIFORNIA PLAINTIFFS' PARTIAL RENEWED MOTION FOR CLASS CERTIFICATION

010616-11/1300654 V2

# I.     INTRODUCTION

In ruling on Plaintiffs' original class certification motion, the Court admitted their expert reports; found that the Rule 23(a) requirements were satisfied for breach of implied warranty of merchantability claims under the Song-Beverly Act, Cal. Civ. Code §§ 1791.1 & 1792, and the Magnuson-Moss Act, 15 U.S.C. § 2301, *et seq.*, as to Class Cars[1] acquired in California; and invited California Plaintiffs to renew their motion for those claims.[2] California Plaintiffs Barry Braverman, Hakop Demirchyan, Joel Green, Dr. Glynda Roberson, and Edo Tsoar now file this partial renewed motion to certify the proposed California implied warranty class.[3] The Court should also find that the Rule 23(b)(3) requirements of predominance and superiority are satisfied. BMW does not dispute that all Class Cars have the same allegedly defective Range Extender with the same propensity to cause rapid reduction in speed and prevent accelerating under the same circumstances. Whether this unintended deceleration—especially on highways—poses a safety problem that renders the cars unmerchantable, and whether and how much Class members overpaid for defective cars can all be decided fairly and efficiently on a class-wide basis without individual inquiries. California Plaintiffs also request that the Court appoint Hagens Berman Sobol Shapiro LLP ("HBSS") as Class Counsel, whose experience, fitness, and commitment to representing the Class has not been disputed.[4]

## II.     PROFFER OF EVIDENCE COMMON TO THE CLASS

**A.     Class Cars have a common design defect that causes them to decelerate suddenly and rapidly.**

Documents and corporate witnesses for BMW and its parent company, as well as the testimony of California Plaintiffs' engineering expert, all provide common evidence

---

[1] The Class Cars are BMW i3 REx model years 2014 through 2016, acquired new.

[2] Dkt. No. 185 (May 19, 2020 Order) at 6.

[3] This motion is made without waiver. All Plaintiffs preserve their rights to appeal the Court's order at the conclusion of the litigation.

[4] Dkt. No. 157 (BMW's Opp'n Br.). The Court previously deemed HBSS adequate counsel and accordingly appointed HBSS as Interim Lead Counsel. *See* Dkt. No. 34 at 6-7.

that Class Cars have a common defective design that affects driving safety.[5] This design defect causes Class Cars to decelerate abruptly without allowing the driver to regain speed and without triggering brake lights to warn traffic behind the car of the deceleration. This harrowing experience, hereafter "limp mode," typically occurs when driving on the highway at about 70 mph, and it causes the car's speed to drop to about 40 mph or less, endangering the driver, passengers, and surrounding traffic. All proposed Class representatives of the California Class as well as all individual Plaintiffs from other states have experienced this unsafe event.[6]

California Plaintiffs' electrical engineering expert, Patrick Donahue, confirms that the defect is common to all Class Cars. His report—which BMW does not refute—verified that the Class Car he tested could not maintain highway speeds during "long uphill drives on steep inclines with the [Range Extender] activated" and that his test results are "consistent" with BMW's documentation of the Range Extender's limitations.[7] He confirms that Class Cars have the same "battery, powertrain, and range extender" that "are designed to perform this way for the US market."[8] He opines that allowing the charge to drop below 1.9% creates an unsafe driving situation because drivers cannot maintain minimum highway speeds.[9]

To understand the defect, one has to understand the Class Cars' unique and troubling design. BMW i3s are electric cars. The relevant model years, 2014 through

---

[5] *See infra*, notes 6-46.

[6] Ex. 1 (Braverman at 59:18-61:16); Ex. 2 (Demirchyan at 58:18-63:25); Ex. 3 (Green at 57:6-22); Ex. 4 (Roberson at 97:1-101:1); Ex. 5 (Tsoar at 128:15-130:18); Ex. 6 (Weinstein at 41:1-43:21); Ex. 7 (Curcio at 72:1-77:3); Ex. 8 (Siddiqui at 58:8-62:6); Ex. 9 (Olsen at 69:13-72:8); Ex. 10 (Desatnik at 80:19-84:5); Ex. 11 (Wonderley at 52:17-54:1); Ex. 12 (Lingsweiler at 71:4-25); Ex. 13 (Ridges at 38:1-7); Ex. 14 (Cosinteno at 82:10-91:19). All exhibits ("Ex. _") referenced herein are attached to the Declaration of Steve W. Berman submitted herewith.

[7] Ex. 15 (Expert Report of Pat Donahue dated March 25, 2019 at 10-11).

[8] *Id.* at 11-12.

[9] *Id.* at 11.

-2-

2016, run on a battery pack of 60 a-h batteries.[10] When drawing power directly from their batteries, Class Cars' 170-horsepower electric motor generally permits safe driving at normal speeds on highways, hills, and without regard to outside temperatures. But unlike the BMW i3 BEV, the all-electric version, Class Cars also have a gas-powered electrical generator, known as the "Range Extender." The Range Extender generates electricity to extend Class Cars' driving range beyond the EPA-estimated 81 miles that BEV models get. Class Cars' added range (purportedly double the BEV range) provided a significant enticement to prospective purchasers: BMW estimated that it sold or leased about *four times* as many Class Cars as BEV models, even though BMW's suggested retail price for Class Cars was $3,850 more.[11]

Whereas plug-in hybrids on the market during the May 2014 through May 2016 Class Period can transition from batteries to a gas-powered engine with virtually no interruption in power and "can climb any mountain road in North America without issue," Class Cars cannot.[12] Instead of an engine, they have a 34-horsepower gas-powered generator designed to power an electric motor with five times that horsepower.[13] This generator produces no more than 23.5 kW of electricity.[14]

But the design flaw does not end with the low output of the generator. In European markets, BMW's parent company offers a safer version of the BMW i3 REx that allows drivers to set the Range Extender to start when their batteries still have a 75% state of

---

[10] *Id.* at 4.

[11] Ex. 16 (Strauss at 70:25-71:9) (BMW commonly advertised the REx in terms of total range—*e.g.*, "150-mile total range"); Ex. 17 (BMWNA-ESI-003686-688 at BMWNA-ESI-003687); Ex. 18 (BMW NA's Responses to Request for Admissions – Set One at Responses 1-3).

[12] *See* Ex. 19 (Tom Moloughney, *BMW i3 REx Lawsuit: How'd This Happen & Who's at Fault*, InsideEV (June 3, 2016), https://insideevs.com/news/331321/bmw-i3-rex-lawsuit-howd-this-happen-whos-at-fault/).

[13] Ex. 20 (BMWNA-003835 at 3933).

[14] Ex. 15 at 4.

-3-

charge.[15] This setting permits the Range Extender to further the available range without risking drivers' safety. Class Cars do not have this safety feature: their design only permits the Range Extender to begin generating power when their batteries drop to a 6.5% state of charge.[16]

This combination of an undersized generator and its delayed activation causes dangerous driving conditions. BMW internally conceded that even in common driving situations, "it's possible" for Class Cars "to deplete the high voltage battery beyond the [R]ange [E]xtender's maximum output capability."[17] BMW admitted internally that ██████████████████████████████████████████████████████████████ ███████████████████ █████████████████████████████████████████ ██████████ [19] BMW's parent company found that █████████████████████ ██████████████████████████████████████████████████████████████ ██████████ ██████████████████████████████████████████████ [21] In confidential communications, BMW admitted that █████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██ █

---

[15] Ex. 62 (Robert Kerian, How to Hack a BMW i3 For More Driving Range, Automobile (Sept. 9, 2015), https://www.automobilemag.com/news/how-to-hack-a-bmw-i3-for-more-driving-range/).

[16] Ex. 21 (BMWNA-ESI-030028 and BMWNA-ESI-0030033 at 30033); Ex. 22 (BMWAG-01224-52 and BMWAG-001266-67 at 1251); *see also id.* at 1266; Ex. 23 (Olczak at 152:3-12).

[17] Ex. 24 (BMWNA-ESI-003910 (internal e-mail)).

[18] Ex. 22 (BMWAG-01224-52 and BMWAG-001266-67 at 1267).

[19] Ex. 25 (BMWNA-ESI-003819-20 at 3819).

[20] Ex. 26 (BMWAG-001091_FIN and 001103_FIN at 1093).

[21] *Id.* at 1091.

[22] Ex. 20 (BMWNA-003835 at 3933); Ex. 22 (BMWAG-01224-52 and BMWAG-001266-67 at 1267).

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ██████████ [3] When the Range Extender allows the battery state of charge to drop below

4  1.9%, it reduces the speed and power available to the driver, thus a car with 0.7% charge

5  *will fall into limp mode.*[24] ████████████████████████████████

6  ████████████████████████████████████████████████ [25]

7  Documents from BMW and its parent company demonstrate ████████████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████   ████████████

10 ███████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████

12 ████████████████████████████████.[27]  In internal communications, BMW also

13 acknowledged that ████████████████████████████████████ [28]

14 Adding to the distress of sudden deceleration, BMW admits that the brake lights do not

15 come on to warn drivers behind the cars of their deceleration.[29]

16        From 2014 through 2016, BMW received numerous consumer complaints about

17 the limp-mode defect, and it was aware of scores of other complaints from public

18 sources and surveys.[30] As a typical example, one customer reported, "Considering the

---

[23] Ex. 22 (BMWAG-01224-52 and BMWAG-001266-67 at 1267).

[24] Ex. 27 (BMWNA-ESI-003936 at 3936).

[25] Ex. 22 (BMWAG-01224-52 and BMWAG-001266-67 at 1252).

[26] Ex. 28 (BMWAG-000491_FIN and BMWAG-000502_FIN at 502); Ex. 29 (Borschers at 147:17-150:16).

[27] Ex. 28 (BMWAG-000491_FIN and BMWAG-000502_FIN at 502).

[28] Ex. 21 (BMWNA-ESI-030028 and BMWNA-ESI-0030033 at 30033).

[29] Ex. 23 (Olczak at 295:21-22 ("deceleration is not indicated by the brake lights")).

[30] Ex. 30 (BMWNA-002866-867); Ex. 22 (BMWAG-01224-52 and BMWAG-001266-67 at 1244-49); Ex. 31 (BMWNA-ESI-003677 at 3677); Ex. 32 (BMWNA-ESI-004057 at 4057); Ex. 33 (BMWNA-ESI-008056 at 8056); Ex. 34 (BMWNA-ESI-029821 at 29821); Ex. 35 (BMWNA-ESI-003697 at 3697); Ex. 36 (BMWNA-ESI-006805-806 at 6805).

CALIFORNIA PLAINTIFFS' PARTIAL RENEWED MOTION FOR CLASS CERTIFICATION

010616-11/1300654 V2

main use case for the range extender is for highway road trips within the 120 [to] 130 mile range, I would expect this car to be able to handle most freeway conditions with ease. This car cannot handle . . . the major highways at posted speed limits up the coast or central valley of California . . . ."[31] Another customer complained about "the power loss that the i3's experience when the range extender is called upon" and expressed concerns "for my safety and the safety of others when . . . the range extender kicks in."[32] Another objected: "When I purchased the vehicle I was not told that the Range [E]xtender is not a 'reliable' source of power to the vehicle."[33] Another customer complained: "I was not intending to buy a toy car that I can not even drive back and forth to work safely."[34] One customer reportedly "had been passing someone at 68 mph and [the car] drastically dropped to 40 MPH."[35] Another described a "dangerous[]" experience after the speed dropped "as low as 35 miles per hour—all of sudden—on a freeway" and complained that if "I [had known about it beforehand] I would have never bought it."[36] Another reported that he was limited to 55 mph on the highway, and even after he pulled off the highway, the highest available speed was only 30 mph.[37] After a similar experience, another customer said, "going on gas [Range] [E]xtender on freeway is a 'death trap.'"[38] Another customer complained about being nearly "rear ended 2x" as a result of sudden deceleration.[39] One customer described the scene: "With my foot fully depressed on the accelerator, I had no ability to reverse the decline in speed."[40]

---

[31] Ex. 36 (BMWNA-ESI-006805-806 at 6805).

[32] Ex. 37 (BMWNA-002976-2977 at 2977).

[33] Ex. 38 (BMWNA-002980, BMWNA-002991 at 2991).

[34] Ex. 39 (BMWNA-003066-67, BMWNA-003080 at 3067, 3080).

[35] Ex. 40 (BMWNA-003037-3038 at 3038).

[36] Ex. 41 (BMWNA-003003, BMWNA-003009-10 at 3009-10).

[37] Ex. 42 (BMWNA-002940-943 at 2943).

[38] Ex. 43 (BMWNA-002873, BMWNA-002876 at 2876).

[39] Ex. 44 (BMWNA-002944, BMWNA-002946-47 at 2946-47).

[40] Ex. 45 (BMWNA-002886-2887 at 2887).

-6-

Others told BMW, "when using REx, the power to get up [a] steep hill is so slow and is dangerous,"[41] and the "veh[icle] is unsafe, no power while on REx to go uphill."[42] Similarly, another customer complained: "traveling on an uphill toll road . . . exceeding 70 mph" and "within seconds the car slowed down causing a near-miss accident in the fast lane."[43] Another customer told BMW that when "he was going up a hill it would not go faster than 39 mph and wanted to know if that was normal."[44] Consumers also filed complaints with NHTSA, detailing limp-mode incidents in Class Cars.[45] Drivers often had no prior notice that limp mode was about to occur, or the signal appeared only *after* a sudden drop in power—leaving no time to safely leave the road.[46]

**B.   BMW had an available fix but did not repair Class Cars.**

BMW could easily have altered the software to conform to the safer European version. But BMW had *a lot* to lose if it had done so: ███ in zero-emissions vehicle credits it received for *each* of the 11,000 Class Cars registered in California; a ███ penalty for *each* lost registration that would have caused it to fall short of its zero emissions quota; and the potential loss of its privilege to sell *any* cars in California.[47]

Even so, BMW had other repair alternatives. Beginning with model year 2017, BMW upgraded the BMW i3's 60 a-h batteries to 94 a-h. Because of the 50% increase in charge capacity, Range Extenders in the newer model cars start at a higher power

---

[41] Ex. 30 (BMWNA-002866-867 at 2867).

[42] Ex. 46 (BMWNA-002868-2869 at 2869).

[43] Ex. 38 (BMWNA-002980-2981 at 2981).

[44] Ex. 42 (BMWNA-002940-943 at 2941).

[45] Ex. 47 (NHTSA Complaint Database, ID No. 10817494); Ex. 48 (NHTSA Complaint Database, ID No. 10861225); Ex. 49 (NHTSA Complaint Database, ID No. 10676147).

[46] Ex. 50 (BMWAG-000001_FIN at 00001_FIN (adding warning is "[n]ecessary . . . on the basis of estimation [of] product liability")); Ex. 51 (BMWNA-ESI-003919-920 at 920); Ex. 23 (Olczak at 247:12-25) (indication came with March 2015 software update); *see also* Ex. 8 (Siddiqui at 60:9-61:17) (ineffectual warning).

[47] Ex. 52 (BMWNA-ESI-02285); Ex. 53 (BMWNA-ESI-024144); Ex. 23 (Olczak at 22:14-21).

threshold and avoid limp mode.[48] In Europe, BMW's parent company offered a battery upgrade to its customers for 7,000 Euros (approximately $7,900).[49] But BMW did not offer this fix to California Plaintiffs or Class members to cure the existing defect,[50] even though it admitted ███████████████████████████████████ and, thus, retrofitting Class Cars is technically feasible.[51] BMW's parent company put to rest any purported qualms about ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ [2]

## C.     The undisclosed defect inflated Class Cars' market price.

Despite its extensive knowledge of a significant safety defect—present in Class Cars but not in otherwise identical European versions, BMW admits that it never revealed the defect in its marketing materials and ads.[53] BMW characterizes its advertising for Class Cars as "negligible" and admits that the small-production vehicle "was never part of any widespread advertising."[54] Its own evidence demonstrates that fewer than 5% of its customers reviewed owner's manuals for any purpose before purchasing or leasing their cars.[55] But had Class members read the manuals before acquiring their cars, they would not have learned that the Range Extender decreases vehicle speed, nor would they find any "warning," "danger," "hazard," or "caution"

---

[48] Ex. 29 (Borschers at 237:24-238:1); Ex. 23 (Olczak at 54:7-56:7).

[49] Ex. 54 (BMWNA-ESI-007948-49 at 7949).

[50] Ex. 55 (BMWNA-ESI-005652 at 5652); *see also* Ex. 23 (Olczak at 61:6-19, 67:10-72:22) (retrofitting Class Cars with 94 a-h battery is technically feasible).

[51] Ex. 23 (Olczak at 67:14-23).

[52] Ex. 56 (BMWNA-ESI-010026-27 at BMWNA-ESI-010027).

[53] Ex. 16 (Strauss at 88:5-89:7).

[54] Dkt. No. 157 at 4, 11; *see also id.* at 7 (16,000 cars).

[55] Dkt. No. 152-22 ("Isaacson Report"), ¶ 68, Table J.

-8-

010616-11/1300654 V2

used to describe the Range Extender.[56] BMW considered but never adopted a warning that "it's possible to deplete the high voltage battery beyond the range extender's maximum output capability on hilly terrain" and a recommendation to "adjust your driving speed to maintain a high voltage state of charge greater than 2%."[57]

BMW claims to have relied on its dealers to "properly describe" the i3 to Class members, but it did not recommend allowing customers to use the Range Extender during the test drive, where they might have discovered the defect before acquiring their cars.[58] And like the owner's manuals, the materials BMW used to train dealers do not provide any "warning," "danger," "hazard," or "caution" to describe the Range Extender (let alone describing the limp-mode hazard or the specific speeds, grades, weather and temperature conditions that BMW knew would cause it).[59] On the contrary, BMW's training materials falsely assured dealers that it was a "misconception" that the Range Extender "reduces the vehicle's speed,"[60] thereby downplaying any concerns to dealers who had no economic incentive to warn customers where BMW had not.[61]

How poorly BMW informed consumers about the limitations of the Range Extender did not escape the notice of Tom Moloughney, an occasional guest speaker at BMW dealer training sessions, who remarked, when this lawsuit was filed: "There's a clear disconnect between BMW and the customer with regards to how the [R]ange [E]xtender functions, and what its purpose is."[62] As late as June 2016, he found it "clear" that "people are buying these cars without really understanding how they work."[63] He

---

[56] *See* Ex. 57 (BMWNA-002135 and BMWNA-002215-16 at BMWNA-002215-16); Ex. 63 (BMWNA-002704-05); Ex. 58 (BMWNA-002460-61 at BMWNA-002460-61).

[57] Ex. 24 (BMWNA-ESI-003910 at 3910).

[58] Ex. 16 (Strauss at 88:16-90:3); Ex. 23 (Olczak at 188:23-189:3, 219:2-19).

[59] Dkt. No. 157 at 5-6.

[60] Ex. 59 at 3998.

[61] Ex. 19 (noting that information BMW provided to dealers does not reach customers).

[62] *Id.*

[63] *Id.*

found it "highly doubt[ful]" that "many i3 owners in the US even know [that] BMW purposely restricted software" that would have allowed "for manual operation of the [R]ange [E]xtender" or that "the car could enter a reduced power mode under certain conditions when they bought it."[64] Class members were unlikely to learn of it from some other source. The Class Period saw no investigations into the defect by government, consumer groups, or major media.[65] The isolated complaints about the Range Extender's performance that appeared in blog posts, the NHTSA website, minor internet publications, and a few reviews garnered little consumer notice.[66] *Consumer Reports* is the only major publication to have carried a story (two brief, one-page articles), but it described an inability to accelerate, not a reduction of speed on the highway, and it simultaneously conveyed BMW's false promise of a quick software fix that never materialized.[67]

None of the proposed California Class representatives was aware, when they purchased or leased their BMW i3 RExs, that the Range Extender would cause their cars to decelerate abruptly on the highway.[68] Among individual Plaintiffs from other states, only Plaintiff Adeel Siddiqui encountered prior complaints, but they concerned "power reductions" caused by "hilly terrain," which was irrelevant to him as a Chicago resident.[69] Critically, none of the sources he found "actually warned" him "about the sudden power drops" and "how much power" and "how much speed you can actually lose on the car"[70] or that Chicago's cold temperatures "could reduce the power

---

[64] *Id.*

[65] Dkt. No. 157 at 6; Ex. 60 (Gaskin Rebuttal, ¶¶ 50-55 & Ex. C).

[66] Dkt. No. 157 at 5-6.

[67] Ex. 64; Ex. 65.

[68] Ex. 1 (Braverman at 58:1-64:19); Ex. 5 (Tsoar at 123:11-124:16, 133:16-134:16); Ex. 4 (Roberson at 99:13-101:1); Ex. 2 (Demirchyan at 85:19-87:17, 102:17-103:2); Ex. 3 (Green at 28:3-14, 35:7-25, 57:6-58:7).

[69] Ex. 8 (Siddiqui at 55:23-56:4).

[70] *Id.* at 44:2-5.

significantly without warning and slow the car down to a point where it could be unsafe."[71] While it is true that Plaintiffs Eric Wonderley and Steven Ridges entered into second leases, the context is important. Neither Mr. Wonderley nor Mr. Ridges knew of the defect when they first leased their vehicles.[72] Mr. Wonderley reluctantly accepted a lease for a replacement vehicle based on BMW's false promise that a software update "would fix this problem."[73] And Mr. Ridges only agreed to another lease when his dealership turned a blind eye to the aftermarket software he used to re-code the Range Extender to start at a 75% state of charge like the safer, European models.[74]

Given the paucity of available information about the defect, it is not surprising that the market overestimated Class Cars' value, a finding confirmed by the conjoint survey and regression analysis conducted by Plaintiffs' expert, Mr. Gaskin.[75] Mr. Gaskin's analysis began with a series of questions posed to survey respondents that required them to select their most preferred BMW i3 among several available options with several different prices and attributes, including choices between a defective and a

---

[71] *Id.* at 56:16-20.

[72] Ex. 11 (Wonderley at 52:7-54:1) (Mr. Wonderley describing "nerve racking" drive on "day one" with the Range Extender dropping his speed on the highway down to 40 mph); Ex. 13 (Ridges at 38:1-21) (Mr. Ridges first learned on the defect on the way back from the dealership, when he set his cruise control to 70 mph and it dropped down to 35 mph).

[73] Ex. 11 (Wonderley at 83:4-10); *id.* at 78:8-21 (replacement offered in response to lemon law demand); *see also* Ex. 64 (concurrent announcement of immanent fix by BMW spokesperson).

[74] Ex. 11 (Wonderley at 93:1-96:24). In its prior opposition brief, BMW falsely implied that Plaintiff Charles Olsen purchased a second Class Car with knowledge of the defect, Dkt. No. 157 at 8, when he actually purchased a 2018 model with the *higher capacity* batteries to avoid the defect. Ex. 9 (Olsen at 25:24-26:7). And BMW falsely implied that a dealer warned Plaintiff Brandon Cosinteno (née Redmond) about the defect before leasing his car, Dkt. No. 157 at 8, when the dealership waited until *after* he signed his lease to tell him that "[t]here would be some challenges" driving over mountain passes, and even then "never once were [he and his husband] advised that it would go into power reduction mode, limp mode, and speeds would be cut to 40 miles per hour." Ex. 14 (Cosinteno at 146:23-147:16).

[75] Ex. 66 (Gaskin Report, ¶¶ 12-14).

CALIFORNIA PLAINTIFFS' PARTIAL RENEWED MOTION FOR CLASS CERTIFICATION

non-defective Range Extender.[76] He applied a Hierarchical Bayes regression analysis to the survey results to calculate the statistical influence that a defective Range Extender has on the respondents' purchase decisions relative to price.[77] From this analysis, he calculated a 12.9% difference in the market value between a BMW i3 with the Range Extender defect and an otherwise identical BMW i3 with a non-defective Range Extender.[78]

California Plaintiffs' economics expert, Mr. Weir, whose report the Court also admitted,[79] further opines that even if some class members learned of the defect before entering into a purchase or lease agreement, they still overpaid. He explains that Class Cars' inflated market price reflected the low level of public information and individual consumers' lack of bargaining power to negotiate away the value of a little-known defect.[80]

## III.   ARGUMENT

The Court has already found that California Plaintiffs satisfied Rule 23(a) requirements for BMW's breach of implied warranty of merchantability under the Song-Beverly Act and the Magnuson-Moss Warranty Act. The Court should also find that they satisfy Rule 23(b)(3) requirements. Courts regularly certify implied warranty claims arising from a common design defect affecting safety, and this Court should do so here. Common issues predominate over individual inquiries, making a class proceeding a more efficient and superior method to adjudicate their claims.

The Court should also appoint HBSS as Class Counsel. When appointing HBSS as Interim Lead Counsel, the Court held that the firm has the requisite knowledge, experience, qualifications, resources, and commitment to the proposed class to serve in

---

[76] *Id.*, ¶¶ 41-45.
[77] *Id.*, ¶¶ 16-19, 46-49.
[78] *Id.*, ¶¶ 21, 50-57.
[79] Dkt. No. 185 at 2-3.
[80] Ex. 61 (Weir Rebuttal, ¶ 26).

-12-

that capacity, and BMW does not dispute that HBSS has continued to demonstrate its fitness and commitment to serve as Class Counsel.[81]

**A.    Common issues predominate Class members' implied warranty claims.**

Rule 23(b)(3) allows a class action when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."[82] A common question "is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized class-wide proof.'"[83] In contrast, individual questions require members of a proposed class "'to present evidence that varies from member to member.'"[84] Predominance of common issues does not require that common questions completely dispose of the litigation.[85] Nor must California Plaintiffs demonstrate that *any* common issue "will be answered, on the merits, in favor of the class."[86] As long as "the plaintiffs' claims 'will prevail or fail in unison,'" handling the dispute on a class basis is justified.[87]

Because "the Magnuson–Moss Warranty Act merely provides a federal cause of action for state law implied warranty claims," Class Members must prove the *same* substantive elements of an implied warranty of merchantability under both statutes.[88] Courts "routinely certify implied warranty classes" because they require an objective

---

[81] Dkt No. 34 at 6-7; Dkt No. 157.

[82] Fed. R. Civ. P. 23(b)(3).

[83] *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50, at 196-97 (5th ed. 2012)).

[84] *Id.*

[85] *Local Jt. Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).

[86] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

[87] *Abdullah v. U.S. Sec. Assocs. Inc.*, 731 F.3d 952, 967 (9th Cir. 2013) (quoting *Amgen*, 568 U.S. at 460).

[88] *In re Apple iPhone 3G Prods. Liab. Litig.*, 728 F. Supp. 2d 1065, 1072 (N.D. Cal. 2010); 15 U.S.C. § 2301(7).

-13-

standard, which is "susceptible of common proof"[89] and because individual "circumstances of the transaction do not matter for the implied warranty claim."[90]

Common issues will predominate the trial of these claims because the key evidence necessary to establish them is common to all members of the Class: (1) whether Class Cars have a common design defect that is substantially certain to result in malfunction during the cars' useful life;[91] (2) whether the defect presents safety and performance concerns that render the cars unfit "for the ordinary purposes for which such goods are used";[92] (3) whether the failure of the product to have the expected quality was a substantial factor in causing Class members harm;[93] and (4) whether Class members are entitled to "the cost of repairs necessary to make the goods conform" or the difference in value of the product received and the product as warranted.[94] The evidence to establish California Plaintiffs' implied warranty claims changes little if there are 100 Class members or thousands.

### 1. Proof that Class Cars' Range Extender is defective will not vary amongst Class members.

To support an implied warranty claim in cases involving a latent defect, plaintiffs must prove that the defect existed at the time of sale and is substantially certain to result in malfunction during the useful life of the car.[95] Courts in this Circuit commonly certify classes alleging cars with latent design defects because the core questions are

---

[89] *Zakaria v. Gerber Prods. Co.*, 2016 U.S. Dist. LEXIS 184861, at *39 (C.D. Cal. Mar. 23, 2016).

[90] *Rosenbaum v. Toyota Motor Sales, U.S., Inc.*, 2016 U.S. Dist. LEXIS 193377, at *5 (E.D. Mich. Nov. 28, 2016) (relying on 26 Am. Jur. Proof of Facts 2d *Sales: Implied Warranty of Merchantability* § 17), aff'd, 708 F. App'x 242 (6th Cir. 2017).

[91] *Victorino v. FCA US LLC*, 326 F.R.D. 282, 291 (S.D. Cal. 2018).

[92] Cal. Civ. Code §§ 1792, 1791.1(a); *Sloan v. GM LLC*, 2020 U.S. Dist. LEXIS 71982, at *141 (N.D. Cal. Apr. 23, 2020).

[93] *Deutsch Hollandische Tabakgesellschaft mBH & Co., KG v. Trendsettah USA, Inc.*, 2018 WL 4849707, at *4 (C.D. Cal. Jul. 31, 2018).

[94] Cal. Civ. Code § 1794(2); Cal. Com. Code § 2714(2).

[95] *Victorino*, 326 F.R.D. at 291.

-14-

"particularly suited to resolution as a class action."[96] Determining the existence of a design defect does not require any individualized inquiries into the condition of any particular product; it suffices to show that all class products have the same relevant design feature and that it malfunctions in the same way.

For example, in *Salas v. Toyota Motor Sales, United States, Inc.*, where the plaintiffs claimed that a design flaw caused the car's HVAC to produce a bad odor, the defendant urged the court not to certify the implied warranty claim because it purportedly would require mini-trials to determine whether the HVAC had actually malfunctioned for each class vehicle and if so, the severity of any odor caused by the HVAC.[97] The court disagreed, holding that a jury could determine whether a defect exists in all class vehicles by evaluating evidence of the similarity of the HVAC design across all class vehicles and whether the design provided adequate drainage to prevent

---

[96] *Alger v. FCA US LLC*, 334 F.R.D. 415, 428 (E.D. Cal. 2020) (certifying class asserting defectively designed car headrest); *see also Sloan v. GM LLC*, 2020 U.S. Dist. LEXIS 71982 (N.D. Cal. Apr. 23, 2020) (certifying class of vehicles with defective oil consumption); *Huu Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811 (9th Cir. 2019) (reversing order denying certification of vehicles with defective clutch class); *Victorino v. FCA US LLC*, 2019 U.S. Dist. LEXIS 180112 (S.D. Cal. Oct. 17, 2019) (certifying defective clutch class); *Salas v. Toyota Motor Sales, U.S., Inc.*, 2019 U.S. Dist. LEXIS 77847 (C.D. Cal. Mar. 27, 2019) (certifying defectively designed car HVAC class); *In re MyFord Touch Consumer Litig.*, 2016 U.S. Dist. LEXIS 1794876 (N.D. Cal. Sept. 14, 2016) (certifying defectively designed car infotainment class); *Falco v. Nissan N. Am., Inc.*, 2016 U.S. Dist. LEXIS 46115 (C.D. Cal. Apr. 5, 2016) (certifying vehicles with defective timing chain class); *Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 U.S. Dist. LEXIS 188824 (C.D. Cal. May 29, 2015) (certifying vehicles with defective oil consumption settlement class); *Banks v. Nissan N. Am., Inc.*, 301 F.R.D. 327 (N.D. Cal. 2013); *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504 (C.D. Cal. 2012) (certifying defective rear suspension class); *Kearney v. Hyundai Motor Am.*, 2012 U.S. Dist. LEXIS 200327 (C.D. Cal. Dec. 17, 2012) (certifying defective car air bag system settlement class); *Milligan v. Toyota Motor Sales, U.S.A., Inc.*, 2012 U.S. Dist. LEXIS 189782 (N.D. Cal. Jan. 9, 2012) (certifying defective car engine control module settlement class); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) (reversing order denying certification of defective vehicle alignment class); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D. Cal. 2008) (certifying class of vehicles with defective flywheels); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524 (N.D. Cal. 2004) (certifying defective engine intake class).

[97] 2019 U.S. Dist. LEXIS 77847, at *8.

-15-

odor-causing bacterial growth.[98] In *Alger v. FCA US LLC*, the court likewise held that a jury could determine class-wide the existence of a latent defect based on evidence that all class vehicles had the same headrest design and a common mechanism that allegedly causes head injury.[99] And the court in *Sloan v. GM LLC* likewise held that evidence that all class vehicles have the same piston rings that allegedly cause a drop in oil pressure demonstrated that a jury could determine class-wide whether the cars have the same excess oil consumption defect.[100]

None of the courts required the plaintiffs to submit evidence at the class certification stage that the latent defect is substantially certain to arise in all class vehicles during the vehicles' useful life. As the *Alger* court explained, cars with the same latent defect have the same likelihood of manifestation, thus at trial a "merits inquiry will resolve that question in one stroke."[101] In other words, Plaintiffs and Class members will present the *same* evidence on the defect question, making this common issue "more prevalent or important than the non-common, aggregation-defeating, individual issues."[102]

California Plaintiffs here easily meet the necessary showing. They present common documentary and testimonial evidence demonstrating that Class Cars' Range Extender share the same alleged design flaws—*i.e.*, an underpowered 34-horsepower generator to generate electricity for a 170-horsepower motor and operating software that delays the generator's activation until the car's batteries are nearly depleted.[103] California Plaintiffs' engineering expert and the documentary and testimonial evidence

---

[98] *Id.* at 8-13.

[99] 2020 U.S. Dist. LEXIS 27404, at *9.

[100] 2020 U.S. Dist. LEXIS 71982, at *126-32.

[101] 2020 U.S. Dist. LEXIS 27404, at *23; *see also Sloan*, 2020 U.S. Dist. LEXIS 71982, at *143 (quotation omitted); *Salas*, 2019 U.S. Dist. LEXIS 77847, at *29; *Alger*, 2020 U.S. Dist. LEXIS 27404, at *23-24; *Keegan*, 284 F.R.D. at 537; *Wolin*, 617 F.3d at 1173 (proof of defect manifestation is not a prerequisite to class certification).

[102] *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

[103] *See supra*, Section II.A.

of BMW and its parent company provide common evidence that this defective design prevents Class Cars from maintaining a safe state of charge even when the Range Extender still has gas in the tank.[104] Testimony and documents from BMW and its parent company disclose multiple common driving scenarios that cause this unsafe state of charge, including driving on highways, hills, or in very cold or very hot weather.[105]

Notably, the *Sloan* court held that "the persistence of . . . problems over time, coupled with information that suggests that [a part] replacement was a significant part of the solution to those problems, indicates that there may be a classwide answer to the question of whether . . . class vehicles were defective."[106] Here, too, evidence that persistent limp mode problems ended with the introduction of higher capacity batteries as well as the absence of reported problems with the differently designed European cars likewise confirms that the question of a defect can be answered class-wide.

## 2. Common evidence demonstrates that the defectively designed Range Extender presents safety concerns that render all Class Cars unmerchantable.

BMW does not dispute that the Range Extender functions the same way for all Class Cars. "If each [Class Car] is similarly flawed, it follows that each would breach (or not) the [implied warranty of merchantability] in materially the same way," making it a perfect candidate for class adjudication.[107] This is particularly true here because a vehicle with a "safety defect . . . is not fit for its ordinary purpose."[108] For example, in *Sloan v. GM LLC*, the defendant argued that proving the merchantability of cars with allegedly defective oil consumption would require individualized inquiries into each class members' vehicle use and performance.[109] The court disagreed because the

---

[104] *Id.*

[105] *Id.*

[106] 2020 U.S. Dist. LEXIS 71982, at *130.

[107] *MyFord Touch*, 2016 U.S. Dist. LEXIS 179487, at *72.

[108] *Sloan*, 2020 U.S. Dist. LEXIS 71982, at *141.

[109] *Id.* at *141.

-17-

plaintiffs presented evidence that the defect causes safety problems, which permitted a jury to decide merchantability without individual inquiries.[110] Here, too, California Plaintiffs present substantial evidence of a safety defect, including documents from BMW and its parent company, that acknowledge the safety risk when driving on hills, highways, or in extreme temperatures.[111] California Plaintiffs' engineering expert also opines that Class Cars pose a safety hazard on highways, and California Plaintiffs and numerous other BMW customers confirm that the sudden deceleration and inability to accelerate has caused many near-accidents on public roadways.[112]

In its prior opposition, BMW's only objection to certifying California implied warranty claims was a merits argument: it claimed that the use of the term "megacity" in its admittedly "negligible" advertising of Class Cars requires individualized inquiries into Class members' use of their cars.[113] But the Song-Beverly Act does not permit a waiver of implied warranty without a conspicuous written disclaimer, which BMW does not claim.[114] Regardless, like the plaintiffs in *Sloan*, California Plaintiffs' theory of merchantability turns not on individual vehicle use or performance, but on the safety risk common to all Class Cars. The prima facie evidence they have submitted in support of this theory satisfies their burden at this stage of the litigation.[115]

**3.  California Plaintiffs can prove causal injury on a class-wide basis.**

To prove causation, California Plaintiffs must show that Class Cars' defective quality was a substantial factor in causing Class members harm.[116] A "substantial factor" is a broad standard, "requiring only that the contribution of the individual cause be more

---

[110] *Id.*

[111] *Supra,* Section II.A.

[112] *Id.*

[113] Dkt. No. 157 at 19; *id.* at 4 ("REx advertising in the U.S. was 'negligible.'").

[114] Cal. Civ. Code § 1792.3; Cal. Civ. Code § 1792.4.

[115] *Tyson Foods, Inc.*, 136 S. Ct. at 1045.

[116] *Deutsch Hollandische Tabakgesellschaft mBH*, 2018 WL 4849707, at *4.

-18-

than negligible or theoretical."[117] It does not require proof that the defect was the "sole or even the predominant or decisive factor" causing injury.[118] Even "a very minor force that does cause harm is a substantial factor."[119]

California Plaintiffs allege that they overpaid for defective cars. Federal courts have accepted and relied on California Plaintiffs' expert, Mr. Gaskin, in similar consumer cases to calculate overcharges on a class-wide basis.[120] This Court likewise admitted Mr. Gaskin's report here.[121] His conjoint survey and Hierarchical Bayes regression analysis provide a reliable method of proving that each Class member overpaid for their defective cars without the need for individualized inquiries.[122] Through these methods, he provides a common, objective measure of the difference in the market value between a BMW i3 with the Range Extender defect and an otherwise identical BMW i3 with a non-defective Range Extender (*i.e.*, a 12.9% differential).[123] California Plaintiffs' economics expert, Mr. Weir, whose report the Court also admitted,[124] further opines that the inflated market price reflects a lack of access to information about the defect.[125] He opines that even if some individual Class members knew about the defect, BMW's non-disclosure still injured them because they lack the bargaining power to negotiate the value of a little-known defect, when "there are

[117] *Marmont v. Bernzomatic Corp.*, 2018 U.S. Dist. LEXIS 227401, at *41 (C.D. Cal. July 31, 2018) (quotation omitted).

[118] *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019) (defining "substantial factor" in context of consumer fraud).

[119] *Marmont*, 2018 U.S. Dist. LEXIS 227401, at *41 (quotation omitted).

[120] *See, e.g.*, *Krommenhock v. Post Foods, LLC*, 2020 U.S. Dist. LEXIS 40463 (N.D. Cal. Mar. 9, 2020); *Hudock v. LG Elecs. U.S.A., Inc.*, 2020 U.S. Dist. LEXIS 54994 (D. Minn. Mar. 30, 2020); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018); *Sanchez-Knutson v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 123237 (S.D. Fla. July 11, 2016).

[121] Dkt. No. 185 at 2-3.

[122] Ex. 66 (Gaskin Report, ¶¶ 12-14).

[123] *Id.*, ¶¶ 50-57.

[124] Dkt. No. 185 at 2-3.

[125] Ex. 61 (Weir Rebuttal, ¶ 25).

1

2

numerous other willing buyers and lessees," who "were totally unaware of the [d]efect and willing to pay the then extant market price."[126]

3

4

5

6

7

8

9

10

11

12

13

14

15

In declining to certify consumer fraud and fraudulent concealment claims, the Court held that the potential for discovering information from other sources precluded a class-wide *inference of reliance* on BMW's omission of the defect.[127] The Court invited California Plaintiffs to narrow their proposed class to implied warranty claims for cars acquired in California.[128] Unlike fraud claims that require proof of reliance, implied warranty only requires proof that the defect served as a substantial factor in causing injury.[129] For example, having satisfied itself that the plaintiffs provided a common method of establishing injury,[130] the court in *In re MyFord Touch Consumer Litigation* certified California breach of implied warranty claims despite the "wide[] availab[ility]" of "negative information about" the car's entertainment system, including "multiple statements by [the defendant] and in news articles," and one plaintiff's awareness before purchasing his car that its entertainment system had "mixed reviews."[131]

16

17

18

19

20

21

22

The Court should likewise certify California Plaintiffs' implied warranty claims. California Plaintiffs provide a common objective standard to measure the difference in market value between a defective and non-defective version of Class Cars. This measure allows a jury to determine on a class-wide basis whether the allegedly defective design of Class Cars had more than a "negligible or theoretical" effect in causing "each class member to pay more than he or she otherwise would have paid for the product."[132]

23

24

25

26

27

28

---

[126] *Id.*, ¶ 26.

[127] Dkt. No. 185 at 5-6.

[128] *Id.* at 6.

[129] *Deutsch Hollandische Tabakgesellschaft mBH & Co., KG*, 2018 WL 4849707, at *4; Judicial Council of California Civil Jury Instruction 1231.

[130] 2016 U.S. Dist. LEXIS 179487 at *46-51.

[131] *Id.* at *67.

[132] *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 989 (C.D. Cal. 2015).

-20-

BMW's purported expert survey on class member knowledge and impact does not alter the analysis. In *Escobar v. Just Born, Inc.*, this Court observed that it need not consider "proffered statistical data and expert analysis" from the defendant that purports to prove what the majority of the public expected from its product because that evidence goes to the merits, not whether class certification is warranted.[133] For the reasons set forth in more detail in the pending motion to exclude Dr. Hibbard, BMW's survey also does not meet the minimum standards of reliability: it includes false premises that suggest false memories, leaves out critical information about driver safety, and poses the central question on knowledge as a single, five-part compound question (generating 32 possible inferences), from which no reliable conclusion can be drawn.[134] These flaws also necessarily pervade Dr. Hibbard's estimate of the purported impact of nondisclosure. When those respondents, who answered that prior knowledge about the Range Extender would not have affected their purchase decision, were asked to explain why, only *30%* offered an explanation that reflected *any understanding* that the Range Extender reduces car's speed or power.[135]

### 4. California Plaintiffs propose a reliable class damages model consistent with their theories of liability.

The damages model California Plaintiffs provide satisfies the *Comcast* requirement that it measure "only those damages attributable to" the plaintiff's theory of liability—*i.e.*, the overcharge amount attributable to the defect.[136] Under the Song-Beverly Act, a jury may measure damages for breach of implied warranty as "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted" or "the cost of repairs

---

[133] *Escobar v. Just Born, Inc.*, 2019 U.S. Dist. LEXIS 165971, at *4 (C.D. Cal. June 19, 2019).

[134] Dkt. No. 162 (Plaintiffs' Motion to Exclude the Opinions of Defendant's Proposed Expert Dr. Johnathan Hibbard).

[135] *Id.* at 11.

[136] *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

CALIFORNIA PLAINTIFFS' PARTIAL RENEWED MOTION FOR CLASS CERTIFICATION

1    necessary to make the goods conform."[137]

2         Mr. Gaskin's conjoint and regression analysis provides the value for the first

3    measure—*i.e.*, the difference in market price between a defective and non-defective car.

4    To calculate aggregate damages, Mr. Weir applies this differential to BMW's own

5    estimates of the average price and the numbers of Class Cars sold and leased in

6    California.[138]

7         Like the plaintiffs in *Huu Nguyen v. Nissan North America, Inc.*, California

8    Plaintiffs alternatively rely on a cost of repair estimate as "a proxy for . . . overpayment

9    of the vehicle[s] at the point of sale" or lease.[139] BMW testified that the higher capacity

10   94 a-h batteries eliminated complaints about the Range Extender's performance, and it

11   acknowledges that it was technically feasible to retrofit Class Cars with the higher

12   capacity batteries.[140] Mr. Weir applies BMW and its parent company's best estimate of

13   the cost of retrofitting Class Cars with the 94 a-h batteries (€7,000 or about $7,872.48)

14   to calculate California Class members' damages based on the retrofit cost.[141]

15        Under both the conjoint and repair-cost measures, Mr. Weir calculates damages

16   to lessee Class members as 39.57% of damages to purchasers, based on his estimate that

17   lessee Class members assumed on average that share of the purchase price under their

18   lease agreements.[142]

19   **B.    A class action is a superior method of adjudicating this dispute.**

20        Rule 23(b) is designed to "achieve economies of time, effort, and expense, and

21   promote . . . uniformity of decision as to persons similarly situated, without sacrificing

22

23

24   ───────────────
     [137] Cal. Civ. Code § 1794(b)(2); Cal. Com. Code § 2714(2).

25   [138] Ex. 67 (Weir Report, ¶¶ 52-53); Ex. 69 (Weir Supplement, ¶¶ 11-14 ).

26   [139] 932 F.3d at 821.

     [140] *Supra*, Section II.B.

27   [141] Ex. 69, ¶ 10.

28   [142] *Id.*, ¶ 16; *see also* Ex. 67, ¶¶ 51-55, 58.

                                        -22-

procedural fairness or bringing about other undesirable results."[143] Consequently, a class action must be superior to other available methods of fair and efficient adjudication.[144]

The first and third non-exclusive factors consider "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Rule 23(b)(3)(A), (C). The value of the claims is too low here to incentivize many Class members to litigate their claims individually and weighs in favor of concentrating the claims in a single forum. This is especially true given the high cost of marshalling the evidence necessary to litigate the claims at issue and the disparity in resources between the typical Class member and a well-funded, litigation-savvy defendant like BMW. As discussed below, California Plaintiffs' counsel have already devoted significant resources to this case. No individual litigant pursuing a purely economic loss case could invest the same resources, and class certification will also conserve scarce judicial resources.[145]

The next factor—the extent and nature of any similar litigation (Rule 23(b)(3)(B))—also favors class certification. The Court consolidated numerous cases in this action, indicating that having a single case makes sense.[146] The final superiority factor— "the likely difficulties in managing a class action" (Rule 23(b)(3)(D))—focuses on whether "'the complexities of class action treatment outweigh the benefits of considering common issues in one trial.'"[147] The question is whether multiple individual lawsuits would be more manageable than a class action, and not whether trying the class

---

[143] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

[144] Fed. R. Civ. P. 23(b)(3).

[145] *Gonzalez-Tzita v. City of L.A.*, 2019 U.S. Dist. LEXIS 226410, at *20-22 (C.D. Cal. Dec. 9, 2019).

[146] Dkt. No. 34.

[147] *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 302 (C.D. Cal. 2011) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001)).

-23-

1    claims is easy.[148] Indeed, this fourth factor "will rarely, if ever, be sufficient to prevent

2    certification."[149] Given that the salient issues in this case will be resolved by common

3    proof, this case can be tried in an efficient manner, and California Plaintiffs do not

4    foresee any serious manageability problems and certainly none that make thousands of

5    individual actions a better alternative. "Given the small size of each class member's

6    claim, class treatment is not merely the superior, but the only manner in which to ensure

7    fair and efficient adjudication of the present action."[150]

8    **C.      The Court should appoint Interim Lead Counsel as Class Counsel.**

9          The Court evaluates counsel based on (i) their work in identifying and

10   investigating California Plaintiffs' claims; (ii) their experience in similar cases; (iii)

11   their knowledge of applicable law; and (iv) the resources to commit to prosecuting the

12   action.[151] As noted above, the Court previously deemed HBSS adequate to serve as

13   Interim Lead Counsel, and in its opposition to Plaintiffs' prior class certification motion,

14   BMW did not challenge HBSS's adequacy to serve as Class Counsel.

15         Each of these considerations weighs in favor of Interim Lead Counsel, who have

16   extensive experience in successfully prosecuting consumer class actions throughout the

17   United States, including in this District.[152] Interim Lead Counsel have demonstrated

18   vigorous and effective prosecution on behalf of the proposed Class, including

19   conducting a comprehensive pre-filing investigation, preparing and filing detailed

20   complaints, responding to BMW's multiple motions to dismiss, reviewing thousands of

21   documents, employing German-language translators, traveling to Europe for a

22   deposition, purchasing a Class Car for testing, and hiring multiple highly qualified

23   experts to determine liability, causation, and damages theories.

24

25         [148] *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004).

26         [149] *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 317 (N.D. Cal. 2018).

           [150] *Gonzalez-Tzita*, 2019 U.S. Dist. LEXIS 226410, at *21.
27
           [151] Fed. R. Civ. P. 23(g)(1)(A)(i).
28
           [152] *See* Ex. 68 (firm resume).

-24-

CALIFORNIA PLAINTIFFS' PARTIAL RENEWED MOTION FOR CLASS CERTIFICATION

Proposed Class Counsel are adequate and satisfy the Rule 23(g) factors.

## IV.   CONCLUSION

The Court has already ruled that California Plaintiffs have met Rule 23(a) requirements for implied warranty. Based on the record of evidence, including expert reports that the Court has already deemed admissible, California Plaintiffs also satisfy Rule 23(b)(3) requirements for the proposed California implied warranty class. HBSS, which has aptly served as Interim Lead Counsel, also satisfies the Rule 23(g) factors for appointment of Class Counsel. California Plaintiffs therefore request that the Court certify the proposed class, appoint them as class representatives, and appoint HBSS as Class Counsel.

DATED: July 6, 2020

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
    Steve W. Berman (*pro hac vice*)
Sean R. Matt (*pro hac vice*)
Barbara A. Mahoney (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: sean@hbsslaw.com
Email: barbaram@hbsslaw.com

Christopher Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7150
Email: christopherp@hbsslaw.com

*Interim Lead Counsel for Plaintiffs and the Proposed Class*

1

2

3

4

5

6

Benjamin F. Johns (*pro hac vice*)
Andrew W. Ferich (*pro hac vice*)
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
Email: bfj@chimicles.com
Email: awf@chimicles.com

7

*Plaintiffs' Executive Committee*

8

9

10

11

12

Jonathan A Michaels
MLG AUTOMOTIVE LAW APLC
600 Anton Blvd., Suite 1240
Costa Mesa, CA 92626
Telephone: (949) 527-6900
Facsimile: (949) 581-6908
Email: jmichaels@mlgaplc.com

13

*Plaintiffs' Executive Committee*

14

15

16

17

Hovanes Margarian (SBN 246359)
THE MARGARIAN LAW FIRM
801 N. Brand Blvd., Suite 210
Glendale, CA 91203
Telephone: (818) 553-1000
Email: hovanes@margarianlaw.com

18

*Additional Class Counsel*

19

20

21

22

23

24

25

26

27

28